In the

# United States Court of Appeals

### For the Seventh Circuit

No. 12-2143

MILIJA ZIVKOVIC,

*Petitioner*,

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent.*

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A017 099 761

ARGUED SEPTEMBER 26, 2012—DECIDED JULY 31, 2013

Before EASTERBROOK, *Chief Judge*, and WOOD and
WILLIAMS, *Circuit Judges.*

WOOD, *Circuit Judge*. Milija Zivkovic, a Serbian who
has been in the United States since 1966, has petitioned
for review of an order of the Board of Immigration
Appeals ordering him removed from the United States.
The Board found that Zivkovic was removable because
he had committed three aggravated felonies and that

he was not eligible for the special relief provided by Section 212(c) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1182(c). Before this court, Zivkovic argues that none of the three felony convictions on which the Board relied can support its removal order. Even if one or more was properly counted, he continues, the Board erred when it rejected his eligibility for Section 212(c) relief. Finally, he complains that the Immigration Judge (IJ) should not have consulted certain conviction records that had been submitted for purposes of his bond proceeding when the IJ was considering his immigration petition.

Resolution of Zivkovic's petition might have been straightforward, but for the fact that two of his convictions are 35+ years old, and the immigration laws have not remained static over that time. Zivkovic realizes that he must knock out all three of the aggravated felonies before his argument about Section 212(c) makes any difference, because a conviction on one alone would be enough to guarantee near-automatic removal. See Immigration and Nationality Act § 237(a)(2)(A)(iii), 8 U.S.C. § 1227(a)(2)(A)(iii). But he believes that he can do so. Our assessment of his argument requires us to delve deeply into the history of the governing provisions of the immigration laws, and in addition to consider what level of deference we owe to the Board's effort to disentangle both the meaning of those statutes and Congress's intent over the years to make various changes retroactive. We conclude that the statutes are ambiguous and that the twin presumptions against retroactivity and implied repeal require us to

grant Zivkovic's petition and to remand for further pro-
ceedings.

**I**

Zivkovic was admitted to the United States as a
lawful permanent resident in 1966. Ten years later, on
October 25, 1976, he pleaded guilty to the Illinois crime
of burglary, now codified at 720 ILCS 5/19-1, and
received a sentence of two to six years. In 1978, following
a jury trial, he was convicted of attempted rape, see
720 ILCS 5/8-4 (current law defining crime of attempt); 720
ILCS 5/11-1.20 (current law defining criminal sexual
assault), and was sentenced to 4 to 12 years in
prison. Years later, on November 16, 2010, he was con-
victed under 720 ILCS 5/19-4(a)(2) for criminal trespass
to a residence with a person present; for that crime,
he received a three-year sentence of imprisonment. On
the same day, he was convicted of aggravated battery,
where the aggravating factor was the victim's age (over
60 years), and received a five-year sentence.

In 2004 Zivkovic received a Notice to Appear from
the Department of Homeland Security (DHS). The Notice
charged that he was removable on several grounds: first,
pursuant to 8 U.S.C. § 1227(a)(2)(A)(iii), as an alien
who has been convicted of an aggravated felony as
defined in 8 U.S.C. § 1101(a)(43)(G); second, for the
attempt or conspiracy to commit a crime defined in
8 U.S.C. § 1101(a)(43)(A) (murder, rape, or sexual abuse
of a minor); and third, under 8 U.S.C. § 1227(a)(2)(A)(ii),
as an alien who has been convicted of two crimes

involving moral turpitude not arising out of a single incident. DHS temporarily closed his case in 2005 to await the conclusion of criminal proceedings in Illinois state court.

On February 22, 2011, with the state case resolved, DHS restored Zivkovic's immigration case to the calendar. This time DHS charged that Zivkovic's 2010 residential trespass conviction was also a basis for his removability because it qualified as a "crime of violence" under the INA; DHS continued to assert that his 1976 and 1978 convictions for the aggravated felonies of burglary and attempted rape supported his removal. On November 17, 2011, the IJ determined that residential trespass is a crime of violence because, like burglary, it involves a substantial risk that physical force may be used. The IJ also concluded that Zivkovic's 1976 and 1978 convictions counted as aggravated felonies because they are so defined in the Illegal Immigrant Reform and Immigrant Responsibility Act of 1996 (IIRIRA). In reaching this conclusion, the IJ relied on a decision of the BIA holding that the Immigration Act of 1990 made "any alien who has been convicted of a crime defined as an aggravated felony, and who was placed in deportation proceedings on or after March 1, 1991, [] deportable regardless of when the conviction occurred." *Matter of Lettman*, 22 I. & N. Dec. 365, 366 (BIA 1998) (*en banc*). The IJ found that Zivkovic was not eligible for discretionary waiver of removal because he went to trial rather than pleading guilty to the 1978 crime, and thus he cannot demonstrate that reliance on discretionary waiver from removal changed his response to those criminal charges.

On appeal, the BIA affirmed the IJ's determinations. Although at one point along the way, DHS had argued that Zivkovic was also removable because he had committed two crimes of moral turpitude, see 8 U.S.C. § 1227(a)(2)(A)(ii), the IJ did not specifically address that charge in his written decision. The Board also found it unnecessary to address that point; it explicitly commented that it was not reaching the moral turpitude ground and instead was affirming solely because of the aggravated felonies and ineligibility for Section 212(c) relief.

## II

Because the standard of review that governs Zivkovic's petition is central to this case, we begin by reviewing the governing principles. To the extent that his petition raises questions of law, our review is generally *de novo*. *Alvarado-Fonseca v. Holder*, 631 F.3d 385, 389 (7th Cir. 2011). Nevertheless, we use the qualifier "generally" because the BIA is an expert agency. In *I.N.S. v. Aguirre-Aguirre*, the Supreme Court held that when a court of appeals confronts questions implicating the Board's "construction of the statute which it administers"—here, the INA—"the court should . . . appl[y] the principles of deference described in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984)." 526 U.S. 415, 424 (1999).

This does not mean, however, that *Chevron* applies to every issue that arises in an immigration case, for the simple reason that some questions of law do not depend

on agency expertise for their resolution. The first preliminary question we must address is whether the question before us—what counts as a "crime of violence" for purposes of INA § 101(a)(43)(F), 8 U.S.C. § 1101(a)(43)(F)—is one for which *Chevron* deference is required. (For convenience, in the remainder of this opinion we omit the parallel citations to the INA and use only the citation found in Title 8.) Section 1101(a)(43)(F) says that "a crime of violence (*as defined in section 16 of Title 18*, but not including a purely political offense) for which the term of imprisonment [is] at least one year." *Id.* (emphasis added). Section 16 of Title 18, which addresses Crimes and Criminal Procedure, is one of the "general provisions" collected in Chapter 1 of the Code. No one thinks that the Board of Immigration Appeals has the authority to set the boundaries of the term "crime of violence" for every criminal prosecution in the United States; the great majority of these cases are entirely unrelated to immigration law. Nor is there any hint that Congress intended the Board to craft a particularized definition of this general statute for use exclusively in immigration proceedings. Instead, Congress elected to refer the Board to the general definition of "crime of violence" when that becomes important for immigration purposes. In these circumstances, one cannot say that the Board exercises any delegated power to interpret the governing statute—18 U.S.C. § 16—and thus *Chevron* deference does not apply to that aspect of the Board's reasoning. See *Flores v. Ashcroft*, 350 F.3d 666, 671 (7th Cir. 2003).

The second preliminary question is whether we owe *Chevron* deference to the Board's decision about the

retroactivity of a newly added provision of the immigration laws. At first glance, this might appear to be a closer question: after all, retroactivity (or the lack of retroactivity) is central to the determination of the content of the law at any given time. But in this case we have the benefit of a Supreme Court decision that is directly on point. In *I.N.S. v. St. Cyr*, 533 U.S. 289 (2001), the Court addressed the question whether certain amendments to the INA should be applied retroactively. The respondent, Enrico St. Cyr, pleaded guilty to a controlled-substance offense; he entered his plea just before the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 110 Stat. 1214, which was quickly amended by IIRIRA, 110 Stat. 3009-546. The specific question before the Court was whether the provisions of AEDPA and IIRIRA eliminating waivers of deportation under INA § 212(c) applied retroactively to a person in St. Cyr's position. Importantly for present purposes, the Immigration and Naturalization Service (DHS's predecessor) had taken the position that the new provisions were retroactive and thus that St. Cyr was ineligible for the 212(c) waiver. Among other things, the agency argued that the Court should extend *Chevron* deference to "the BIA's interpretation of IIRIRA as applying to all deportation proceedings initiated after IIRIRA's effective date [as St. Cyr's was]." 533 U.S. at 320 n.45. The Supreme Court dismissed that argument with the following comment:

> We only defer, however, to agency interpretations of statutes that, applying the normal "tools of statutory construction," are ambiguous. [*Chevron*,

467 U.S.] at 843, n.9; *INS v. Cardoza-Fonseca*, [480 U.S. 421, 447-48 (1987)]. Because a statute that is ambiguous with respect to retroactive application is construed under our precedent to be unambiguously prospective, *Landgraf* [*v. USI Film Products*, 511 U.S. 244, 264 (1994)], there is, for *Chevron* purposes, no ambiguity in such a statute for an agency to resolve.

533 U.S. at 320 n.45. *Landgraf* recognized that Congress has the power to make a statute retroactive, but it stressed that "a requirement that Congress first make its intention clear helps ensure that Congress itself has determined that the benefits of retroactivity outweigh the potential for disruption or unfairness." 511 U.S. at 268.

In *Vartelas v. Holder,* 132 S. Ct. 1479 (2012), the Supreme Court was again confronted with the question whether a provision of the immigration laws operated retroactively. It was a question, as the Court noted, "not addressed by Congress: As to a lawful permanent resident convicted of a crime before the effective date of IIRIRA, which regime governs, the one in force at the time of the conviction, or IIRIRA?" *Id.* at 1483. Noting that Congress did "not expressly prescribe the temporal reach of the IIRIRA provision in question, 8 U.S.C. § 1101(a)(13)," *id.* at 1487, the Court turned directly to *Landgraf,* with no mention of *Chevron,* to answer the question. It observed that the restraint added by IIRIRA ranked as a "new disability" for lawful permanent resident aliens, rejecting the dissent's argument that this was not the case because the legislature had attached no disability to past conduct. *Id.* at 1487-88. It then reiter-

ated that "[t]he operative presumption . . . is that Congress intends its laws to govern prospectively only." *Id.* at 1491. As in *St. Cyr*, the alien had in all likelihood relied on the law that existed at the time of his plea of guilty (before IIRIRA). This independent assessment resulted in a finding of no retroactivity.

Interestingly, the government's brief in *Vartelas* conceded that the Second Circuit "reviews the retroactive application of statutes *de novo*, without *Chevron* deference." Brief for the Respondent at *9 [2009 WL 7498491], *Vartelas v. Holder*, 620 F.3d 108 (2d Cir. 2009). The Second Circuit reiterated this rule in its *Vartelas* opinion, stating that it "consider[s] the issue of retroactivity *de novo*, without giving deference to the opinion of the BIA, as the question . . . does not concern the sort of statutory gap that Congress has designated the BIA to fill, nor a matter in which the BIA has particular expertise." 620 F.3d at 117-18 (internal quotation marks omitted). Although the dissenting Justices in *Vartelas* disagreed on the merits, they did not question the majority's use of *Landgraf* as the governing standard for analyzing the retroactivity question. To the contrary, the dissent said that "the Court is correct that this case is governed by our longstanding interpretive principle that, in the absence of a contrary indication, a statute will not be construed to have retroactive application," citing *Landgraf*. See *Vartelas,* 132 S. Ct. at 1492-93 (dissenting opinion of Scalia, J.).

Unlike our dissenting colleague, we see nothing in the Court's recent decision in *Federal Communications*

*Commission v. Arlington,* 133 S. Ct. 1863 (2013), that under-mines this analysis. *Arlington* reaffirms the general princi-ple that a court must defer to an agency's reasonable interpretation of the scope of its own authority, regardless of whether that issue concerns the agency's jurisdiction or any other interpretation of its enabling statute. *Id.* at 1868 ("No matter how it is framed, the question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, *whether the agency has stayed within the bounds of its statutory authority.*") (Emphasis in original). Nothing in *Arlington* instructs courts to skip the first step of the *Chevron* process—that is, the assessment whether there is any ambiguity to be addressed after applying the ordinary tools of statutory construction. If those tools of statutory construction point clearly to a finding of no retroactivity, that is the end of it: the agency's views never come into play. Because the Supreme Court itself has provided an unam-biguous legal rule for retroactivity questions, and we have no issue before us pertaining to the boundaries of the agency's authority, we conclude that *Arlington* does not drive our analysis here.

We conclude that this is not a situation in which any ambiguity (which if present would trigger deference to the agency) remains after applying the ordinary tools of statutory construction. *St. Cyr* tells us that Con-gress is the master here, and it essentially eliminates ambiguity from the picture by classifying all statutes as prospective except those that Congress has clearly desig-nated as retroactive. Our sister circuits have come to the same conclusion. See *Martinez v. I.N.S.,* 523 F.3d 365,

372-73 (2d Cir. 2008); *Camins v. Gonzales,* 500 F.3d 872, 880
(9th Cir. 2007); *Hem v. Maurer,* 458 F.3d 1185, 1189 (10th
Cir. 2006); *Dinnall v. Gonzales,* 421 F.3d 247, 251 (3d Cir.
2005); *Sarmiento Cisneros v. U.S. Att'y Gen.,* 381 F.3d 1277,
1280 (11th Cir. 2004); *Arevalo v. Ashcroft,* 344 F.3d 1, 9-10
(1st Cir. 2003); *Ojeda-Terrazas v. Ashcroft,* 290 F.3d 292, 300
n.53 (5th Cir. 2002); *Bejjani v. I.N.S.,* 271 F.3d 670, 679-80
(6th Cir. 2001), *abrogated on other grounds by Fernandez-
Vargas v. Gonzales,* 548 U.S. 30 (2006); *Velasquez-Gabriel v.
Crocetti,* 263 F.3d 102, 106 n.2 (4th Cir. 2001). The
question whether Zivkovic's crime qualified under
Section 1101(a)(43)(F) as a "crime of violence," and the
questions whether and to what extent certain amend-
ments to the immigration laws apply retroactively, are
all issues of law that this court must review *de novo,*
without the use of *Chevron* deference.

### III

We turn now to a detailed look at the governing law,
which has changed over the years. The INA itself was
passed in 1952 (Act of June 27, 1952, c. 477, Title I, § 101, 66
Stat. 166); it has been amended many times since then.
The first such amendment that we must consider
appeared in the Anti-Drug Abuse Act of 1988, Pub. L. No.
100-690, 102 Stat. 4181. Section 7342 of that statute
added the term "aggravated felony" to the definitions
found in 8 U.S.C. § 1101(a) through the following
new paragraph:

> (43) The term "aggravated felony" means murder, any
> drug trafficking crime as defined in section 942(c)(2) of

title 18, United States Code, or any illicit trafficking in any firearms or destructive devices as defined in section 921 of such title, or any attempt or conspiracy to commit any such act, committed within the United States.

Section 7343 of the Anti-Drug Abuse Act set out rules for the retention in custody of aliens who had committed aggravated felonies and specified that they were ineligible for voluntary departure. Section 7344 read as follows:

> (a) IN GENERAL.—Section 241(a)(4) (8 U.S.C. 1251(a)(4)) is amended—
>
> (2) [*sic*] by inserting after the semicolon the following: "or (B) is convicted of an aggravated felony at any time after entry;".
>
> (b) APPLICABILITY.—The amendments made by subsection (a) "8 U.S.C. 1251 note" shall apply to any alien who has been convicted, on or after the date of the enactment of this Act, of an aggravated felony.

(Section 1251 was later transferred to 8 U.S.C. § 1227, which is now the section of the law describing which aliens are "deportable.")

It is worth noting in passing that Zivkovic did not become deportable as of November 18, 1988 (the effective date of the Anti-Drug Abuse Act) based on his 1974 and 1976 offenses. That is so for two independent reasons. First is the age of the offenses: both convictions pre-dated the "date of the enactment" of that Act, and they were therefore excluded by Section 7344(B). Second, his crimes of burglary and attempted rape did not fall within the

definition of "aggravated felony" provided by Section 7342 of the Anti-Drug Abuse Act.

In 1990, Congress passed another law amending the INA; it called this simply the Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978. Among many other things, the 1990 Act (as we shall call it, in an effort to minimize confusing acronyms) changed the definition of "aggravated felony" and revised the grounds for deportation. It broadened the definition of "aggravated felony" in a variety of ways. Section 501(a) of the 1990 Act sets out the changes to the definition:

> (a) IN GENERAL.—Paragraph (43) of section 101(a) (8 U.S.C. 1101(a)) is amended—
>
> * * *
>
> (2) by inserting "any illicit trafficking in any controlled substance (as defined in section 102 of the Controlled Substances Act), including" after "murder,",
>
> (3) by inserting after "such title," the following: "any offense described in section 1956 of title 18, United States Code (relating to money laundering), or any crime of violence (as defined in section 16 of title 18, United States Code, not including a purely political offense) for which the term of imprisonment imposed (regardless of any suspension of such imprisonment) is at least 5 years,",
>
> (4) by striking "committed within the United States",
>
> (5) by adding at the end the following: "Such term applies to offenses described in the previous

sentence whether in violation of Federal or State law.", and

(6) by inserting before the period of the sentence added by paragraph (5) the following: "and also applies to offenses described in the previous sentence in violation of foreign law for which the term of imprisonment was completed within the previous 15 years".

Section 501(b) specified the effective date of these changes, stating that

[t]he amendments made by subsection (a) shall apply to offenses committed on or after the date of the enactment of this Act, except that the amendments made by paragraphs (2) and (5) of subsection (a) shall be effective as if included in the enactment of section 7342 of the Anti–Drug Abuse Act of 1988.

Interestingly, although the controlled substance amendments and the clarification with respect to state-law offenses relate back to the Anti-Drug Abuse Act, subpart (3) of the 1990 Act, which adds crimes of violence to the definition, applies only from the date of enactment (November 29, 1990) of the new statute.

Section 602(a) of the 1990 Act amended the law (then 8 U.S.C. § 1251, now § 1227) to restate the criminal offenses that provided grounds for deportation. As amended, Section 1251(a)(2)(A)(iii) provided that "[a]ny alien who is convicted of an aggravated felony at any time after entry is deportable." Section 602(c) (which is central to our analysis below) sets forth a rather opaque set of rules for effective dates:

(c) SAVINGS PROVISION.—Notwithstanding the amendments made by this section, any alien who was deportable because of a conviction (before the date of the enactment of this Act) of an offense referred to in paragraph (15), (16), (17), or (18) of section 241(a) of the Immigration and Nationality Act, as in effect before the date of the enactment of this Act [a series of offenses related to alien registration and wartime crimes], shall be considered to remain so deportable. Except as otherwise specifically provided in such section and subsection (d), the provisions of such section, as amended by this section, shall apply to all aliens described in subsection (a) thereof notwithstanding that (1) any such alien entered the United States before the date of the enactment of this Act, or (2) the facts, by reason of which an alien is described in such subsection, occurred before the date of the enactment of this Act.

Even though the last eight lines of this "savings provision" might be read to make the changes retroactive, the new definition of "aggravated felony" applied only prospectively, according to Section 501(d) of the 1990 Act. Thus, the 1990 Act did not authorize Zivkovic's deportation based on his 1976 and 1978 offenses, since they did not count as aggravated felonies thanks to Section 501(d).

The next material changes that Congress made to the treatment of aggravated felonies appear in IIRIRA, Pub. L. No. 104, Div. C, 110 Stat. 3009-546 (Sept. 30, 1996). IIRIRA did several things relevant to Zivkovic's case. First, it expanded the definition of "aggravated felony" to include

rape and burglary punishable by more than one year imprisonment. Second—and this is the language on which the dissent primarily rests—it includes two statements that bear on retroactivity. The first one says:

> The amendments made by this section shall apply to action taken on or after the date of enactment of this Act regardless of when the conviction occurred.

The second appears in the hanging paragraph at the end of Section 1101(a)(43), and says:

> Notwithstanding any other provision of law (including any effective date), the term [aggravated felony] applies regardless of whether a conviction was entered before, on, or after September 30, 1996 [*i.e.,* the date of IIRIRA's enactment].

IIRIRA also repealed Section 212(c) of the INA, which had given the Attorney General discretion to waive removal of aliens who had resided in the U.S. for at least seven years. In *St. Cyr,* the Supreme Court held that the repeal of Section 212(c) operated only prospectively.

We address the effect of IIRIRA on the earlier statutes in more detail below, as we consider Zivkovic's specific arguments. In short, however, Zivkovic can avoid removal only if he either can demonstrate that none of the three convictions on which DHS relied can serve as the basis of its removal order, or, failing that, he can seek relief from removal under Section 212(c).

**IV**

We begin by clearing away two issues that appear relatively straightforward to us: Zivkovic's eligibility for Section 212(c) relief, and the use of his 2010 conviction for criminal trespass to a residence as a basis for his removal as an aggravated felon. We then turn to the more difficult question, common to the 1976 and 1978 convictions, whether they can support the Board's decision.

A. Section 212(c)

We take up this point first simply to emphasize the importance of the legal effect of Zivkovic's three crimes. Because he is not eligible for Section 212(c) relief under this circuit's law, his case turns exclusively on the proper treatment of those crimes.

Although the Supreme Court found in *St. Cyr* that IIRIRA's repeal of Section 212(c) relief was not retroactive, its opinion was not unqualified. Instead, the Court distinguished the situation of "people who entered into plea agreements with the expectation that they would be eligible" for that relief. *St. Cyr,* 533 U.S. at 321. It noted that plea agreements "involve a *quid pro quo* between a criminal defendant and the government." *Id.* We have understood *St. Cyr* to require a demonstration that the defendant affirmatively abandoned rights or admitted guilt in reliance on a chance of obtaining Section 212(c) relief. See *Khodja v. Holder,* 666 F.3d 415, 420 (7th Cir. 2011) (applying *St. Cyr* to petitioner who af-

firmatively abandoned his right to pursue a judicial recommendation against deportation).

The Court's later decision in *Vartelas,* however, cautioned against placing too much weight on actual reliance. In *Vartelas,* the Court had to rule on the retroactivity of a provision of IIRIRA limiting the right of a permanent resident alien who had been convicted of a felony to travel outside the United States and then return as a matter of right. It decided against retroactivity. The loss of the right to leave the country briefly and then return, it concluded, imposed a new disability on this class of persons. As the Court noted, "neither [Vartelas's] sentence, nor the immigration law in effect when he was convicted and sentenced, blocked him from occasional visits to his parents in Greece." 132 S. Ct. at 1487. Where a finding of retroactivity would saddle the petitioner with new consequences from an old conviction, the affected person need not also demonstrate that he relied on the absence of those new consequences. This did not mean, however, that reliance had to be disregarded entirely; to the contrary, the Court observed that "[w]hile the presumption against retroactive application of statutes does not require a showing of detrimental reliance, reasonable reliance has been noted among the 'familiar considerations' animating the presumption." *Id.* at 1491 (quotations and citations omitted).

Based on *Vartelas,* the Fifth Circuit has concluded that even people who have rejected a plea agreement and gone to trial may take advantage of *St. Cyr*'s ruling. *Carranza-De Salinas v. Holder,* 700 F.3d 768 (5th Cir. 2012).

The petitioner there had delayed appealing her convic-
tion so that she could build a record showing rehabilita-
tion, and then the law changed to eliminate Section
212(c) relief. *St. Cyr*'s general holding about the non-
retroactivity of the repeal of Section 212(c), along with
petitioner's demonstrated "likelihood of reliance on
prior law," were enough to convince the Fifth Circuit to
hold that the petitioner was entitled to pursue Section
212(c) relief. *Id.* at 773-74. Zivkovic does not point to a
similar record, and so we are inclined to save for another
day the question whether we should revisit the role
that reliance has played in this court's law. We focus
instead on the point that was central to *Vartelas*—the fact
that retroactive application of the travel restrictions
would have imposed a significant new legal disability on
the petitioner entirely apart from the consequences of
a criminal conviction on a person's eligibility for
relief under Section 212(c). In Zivkovic's case, the only
disabilities on the table are the criminal convictions
themselves, not a right to travel, to work, or the like. It
is true that IIRIRA, by adding his offenses to the ranks
of "aggravated felonies," changed the consequences
for removability, but we do not understand that to be
the kind of additional legal disability that *Vartelas* was
addressing.

To the extent that reliance remains relevant, we note
as well that there is no way that Zivkovic could have
relied on Section 212(c) when either his 1976 or his 1978
criminal cases were adjudicated, for the simple reason
that the law did not provide for removal based on
those felonies at all. Thus, unlike St. Cyr, who prevailed

on a retroactivity challenge because of the loss of a chance to avoid removal based on an offense that had supported removal since 1988 (sale of a controlled substance), Zivkovic presents a case in which the underlying offenses were not even on the aggravated felony list until 18 and 20 years after his convictions for them. He is thus in the strange position of seeking relief under Section 212(c) based on offenses that did not become aggravated felonies until the passage of the very statute that repealed Section 212(c).

We conclude that Section 212(c) relief is not available in this unusual situation. We do so both because Zivkovic did not incur a new legal disability in the sense that *Vartelas* used, nor did he rely on the availability of Section 212(c) relief. The Board thus correctly found that Zivkovic is ineligible as a matter of law for relief under Section 212(c). This means that his petition for review can be granted only if none of the three convictions on which the Board relied could support his removal as an aggravated felon.

### B.  The 2010 Conviction: Residential Trespass

As it reads today, the INA provides that "[a]ny alien who is convicted of an aggravated felony at any time after admission is deportable." 8 U.S.C. § 1227(a)(2)(A)(iii). Turning back to the definitions section of the Act, 8 U.S.C. § 1101, we find an extensive list of crimes that Congress has identified as aggravated felonies. *Id.* § 1101(a)(43)(A) through (U). The only one that applies to Zivkovic is subpart (F), which (as we already have noted) identifies

"a crime of violence (as defined in section 16 of Title 18, but not including a purely political offense) for which the term of imprisonment [is] at least one year." Title 18, section 16, provides that

> The term "crime of violence" means–
>
> (a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 16. This is a familiar test: subpart (a) relies on the formal elements of the offense, while subpart (b) turns on the existence of a substantial risk of physical force.

The Illinois felony of residential trespass found in 720 ILCS 5/19-4(a)(2) is committed

> when, without authority, [the person] knowingly enters the residence of another and knows or has reason to know that one or more persons is present or he or she knowingly enters the residence of another and remains in the residence after he or she knows or has reason to know that one or more persons is present.

*Id.* All parties agree that this crime does not include as an element the attempted or threatened use of physical force against the person or property of another. It therefore does not qualify as a crime of violence

under 18 U.S.C. § 16(a). The more difficult question is whether residential trespass is a crime involving a substantial risk that physical force will be used against the person or property of another for purposes of 18 U.S.C. § 16(b).

In construing Section 16(b) in an immigration case, the Supreme Court has taken a categorical approach. See *Leocal v. Ashcroft*, 543 U.S. 1 (2004). We know this because the underlying facts in *Leocal* left no doubt that physical force actually had been used against another: the petitioner there was convicted of driving under the influence of alcohol, and the underlying facts showed that he had crashed and caused serious injury to someone. The Court confirmed that the language of Section 16 "requires us to look to the elements and the nature of the offense of conviction, rather than to the particular facts relating to petitioner's crime." *Id.* at 7. See *Jimenez-Gonzalez v. Mukasey*, 548 F.3d 557, 561 (7th Cir. 2008). Applying that test, it explained that even though driving under the influence of alcohol is physically dangerous, that is not enough. Section 16(b) does not encompass all negligent misconduct, nor does it cover all offenses that create a substantial risk that injury will result from the person's conduct. 543 U.S. at 10. A *mens rea* higher than "the merely accidental or negligent conduct involved in a DUI offense" is necessary. *Id.* at 11. "[R]eckless disregard in § 16(b)," the Court explained, "relates *not* to the general conduct or to the possibility that harm will result from a person's conduct, but to the risk that the use of physical force against another might be *required*

in committing a crime." *Id.* at 10 (first emphasis in original, second emphasis added). The Court added that the phrase "crime of violence" suggests "a category of violent, active crimes," and cautioned against blurring the distinction between the "violent crimes Congress sought to distinguish for heightened punishment and other crimes." *Id.* at 11.

In Zivkovic's case, the BIA began appropriately by applying *Leocal*'s "categorical approach." In determining that "residential trespass" is a violent crime, it analogized that crime to burglary, which the Supreme Court has recognized as a "classic" example of a crime meeting the requirements of Section 16(b). *Id.* at 10. The BIA also relied on this court's ruling that "residential entry" is a crime of violence under Section 4B1.2 of the U.S. Sentencing Guidelines; that section calls for enhanced penalties for offenses "involv[ing] conduct that presents a serious *potential risk of physical injury* to another." U.S.S.G. § 4B1.2(a)(2); see *United States v. Gardner*, 397 F.3d 1021, 1023 (7th Cir. 2005) (emphasis added). In *Gardner,* the relevant statute said that "[a] person who knowingly or intentionally breaks and enters the dwelling of another person commits residential entry, a Class D felony." Ind. Code § 35-43-2-1.5 (1993). *Id.* at 1023. That crime, we concluded, qualifies as a crime of violence under Section 4B1.2 of the Guidelines and perhaps even 18 U.S.C. § 16(b), on which the government had relied by analogy. *Id.* at 1023-24. In the course of *breaking* and entering, there is a "serious risk that an occupant *could be injured*." *Id.* at 1024 (emphasis added).

*Gardner* differs from the present case, however, in ways that the BIA failed to recognize. First, the definition of "crime of violence" under Section 4B1.2 of the sentencing guidelines is significantly different from the one found in Section 16(b). The guidelines require only a "*potential* risk of physical *injury*," while Section 16(b) requires a "*substantial* risk that physical *force*" may be used. (Emphasis added.) The level of risk is therefore different. In addition, a risk of "physical injury" (Section 4B1.2) is not the same as the risk that the offender will apply "physical force" (Section 16(b)) to the victim. Physical force may or may not result in injury, depending on how severe it is. *Cf. Johnson v. United States,* 559 U.S. 133, 140, 130 S. Ct. 1265, 1270-71 (2010) (holding that the term "physical force" in 18 U.S.C. § 924(e)(2)(B)(i) "means *violent* force—that is, force capable of causing physical pain or injury to another person") (emphasis in original). The Court's analysis in *Leocal* illustrates the difference between these two standards. Driving under the influence presents a "risk of physical injury," but the Court found that this was not the same as the intentional, active "use of physical force" described in Section 16(b). In *Gardner*, the crime of "residential entry" required knowing or intentional breaking and entering the dwelling of another. *Gardner*, 397 F.3d at 1023. This kind of breaking and entry offense closely resembles burglary, and it is logical to assume that there is a substantial risk that physical force at least against the property of another will be used in the commission of the offense.

We recognize that since *Gardner,* the Supreme Court has concluded that attempted burglary qualifies as a

crime of violence under the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e). See *James v. United States,* 550 U.S. 192 (2007). In our view, however, *James* does not undermine *Leocal*'s holding; indeed, the majority did not even cite *Leocal. James* involved ACCA, which like the guidelines defines a crime of violence as an offense "involv[ing] conduct that presents a serious potential risk of physical injury to another." § 924(e)(2)(B). The standard under ACCA thus differs materially from the one under 18 U.S.C. § 16(b): the latter requires *active* use of physical force, while the former looks only for *potential* risk of physical injury.

The residential trespass crime that Zivkovic committed requires only entry or remaining in a house, with the knowledge that another person is present; it says nothing about "breaking" or any other force. It thus is quite different from the crimes in *Gardner* and *James,* where the offenses necessarily involved the intentional violation of the will of the property owner. In contrast, the Illinois statute that Zivkovic violated says that the entry (or remaining) must be "without authority"; it does not say that the person had to *know* that the entry (or act of remaining) was unauthorized. A person could commit residential trespass by walking through a neighbor's open door under the mistaken belief that she is hosting an open house, a party, or a garage sale. *People v. Davis*, 968 N.E.2d 682, 685-86 (Ill. App. Ct. 2012) (holding that the "without authority" element of Section 19-4(a)(2) need not be knowing). Importantly, Illinois has a crime of "home invasion" that is more serious than residential trespass but less serious than burglary. "Home

invasion" is residential trespass plus either physical injury, use of force, or threats to use force. 720 ILCS 5/19-6(a)(4). This crime, which does contemplate the use of force, is closer to the Indiana crime of residential entry at issue in *Gardner* or to the generic crime of burglary. We conclude that the BIA erred by characterizing the Illinois residential trespass crime as a "crime of violence" for purposes of the aggravated felony provision of the INA.

## C. The 1976 and 1978 Convictions

There is no question that Zivkovic's old convictions meet the current definition of a "crime of violence" under 18 U.S.C. § 16, and thus under the INA, 8 U.S.C. § 1101(a)(43)(F). The 1976 conviction was for burglary, and the 1978 conviction was for attempted rape, and Zivkovic received substantial sentences for each one (two to six years and four to twelve years). The issue here is retroactivity: does the net effect of the changes in the INA that we described in Part III of this opinion allow the Board to rely on those convictions to support removal?

Our dissenting colleague believes that this is a simple question to answer. He points to the language in the hanging paragraph to 8 U.S.C. § 1101(a)(43), which as we noted above provides that "[n]otwithstanding any other provision of law (including any effective date), *the term* [aggravated felony] applies regardless of whether a conviction was entered before, on, or after [IIRIRA's effective date]." (Emphasis added.) We agree with him

that this clearly makes the new *definition* applicable to all prior convictions. But it is one thing to define conduct as an aggravated felony, and a distinct thing to conclude that the sections of the statute prescribing grounds for removal have also been amended.

We are not the first to make this observation. Both the Supreme Court and the BIA have consistently distinguished between definitions and consequences. See 8 C.F.R. § 316.10(b)(1); *St. Cyr;* and *Matter of A-A-*, 20 I. & N. Dec. 492 (BIA 1997). Recognizing that distinction here does not deprive either the amended definition of "aggravated felony" or the hanging paragraph of force. To the contrary, there are many immigration consequences from being an aggravated felon other than removability, and no one has argued that IIRIRA does not apply with full force to most of them. For example, someone defined as an aggravated felon pursuant to IIRIRA is ineligible for any discretionary waiver of removal (either the cancellation of removal otherwise possible for legal permanent residents or a discretionary waiver of inadmissibility for those guilty of a crime of moral turpitude); he is ineligible for any discretionary immigration benefit that requires a showing of good moral character, such as seeking U.S. citizenship; he may not seek asylum or withholding of removal based on the threat of persecution in the country of removal; if removed on other grounds, an aggravated felon may not reenter the country legally without a special waiver; and an aggravated felon is ineligible for voluntary departure. See generally IMMIGRATION

POLICY CENTER, *Aggravated Felonies: An Overview*, http://www.immigrationpolicy.org/just-facts/aggravated-felonies-overview (last visited July 26, 2013). The point is that each consequence must be evaluated independently, to see if Congress intended to import the new definition (reaching all aggravated felonies, no matter when committed) into that part of the statute.

The Board has taken the position that the 1990 Act created a comprehensive new statutory framework, which consolidated the grounds for deportation and repealed by implication a variety of earlier scattered statutory provisions, including Section 7344(b) of the Anti-Drug Abuse Act of 1988. See *Matter of Lettman,* 22 I. & N. Dec. 365 (BIA 1998) (*en banc*). In *Lettman,* a majority of the Board permitted use of a pre-1988 conviction for murder (a crime defined as an aggravated felony in the Anti-Drug Abuse Act of 1988) to support the alien's removal. It did so despite the fact that the Anti-Drug Abuse Act, which had added for the first time the term "aggravated felony," also highlighted the prospective nature of this change in Section 7344(b). The Board relied on the language providing that the amendments "shall apply to any alien who has been convicted, on or after the date of the enactment of this Act, of an aggravated felony." Three members of the Board dissented.

Initially, the Eleventh Circuit ruled that the Board had erred in *Lettman,* see 168 F.3d 463 (11th Cir. 1999), but upon reconsideration the court decided to give *Chevron* deference to the Board's understanding of the effective date of the changes made by the 1990 Act. 207 F.3d 1368,

1370 (11th Cir. 2000). The court did so in reliance on *I.N.S. v. Aguirre-Aguirre,* 526 U.S. 415 (1999), which had commanded such deference to the Board's interpretation of the term "serious nonpolitical crime" for purposes of 8 U.S.C. § 1253(h)(2)(C). But the Eleventh Circuit failed to note that the question of retroactivity before it is quite different from the question how to interpret a particular phrase unique to the immigration laws. We have already explained why we do not believe, in light of *St. Cyr* and *Vartelas,* that *Chevron* deference applies to retroactivity determinations, even though it does apply to run-of-the-mill questions of interpretation that are unique to the immigration statutes and thus within the Board's expertise, such as the one in *Aguirre-Aguirre.*

The absence of *Chevron* deference does not mean that we must disregard the Eleventh Circuit's underlying reasons for upholding the result in *Lettman;* it means only that we evaluate the Board's position in *Lettman* with an open mind, bearing in mind the more flexible principles of *Skidmore v. Swift & Co.,* 323 U.S. 134 (1944), and *United States v. Mead Corp.,* 533 U.S. 218 (2001). In reviewing the Board, the Eleventh Circuit began with the proposition that the 1990 Act redesignated the aggravated felony ground but did not expressly either enact or re-enact any corresponding date restriction. The only help with respect to dates comes from Section 602(c) of the 1990 Act, set forth above. Unfortunately, the second sentence of that provision is practically indecipherable:

> Except as otherwise specifically provided in *such
> section* and subsection (d), the provisions of *such
> section*, as amended by this section, shall apply
> to all aliens described in subsection (a) thereof not-
> withstanding either that the alien entered the United
> States before the 1990 Act took effect or that the
> grounds for deportation occurred before the date of
> the enactment of this Act.

(Emphasis added.) The Board recognized that it is
difficult at best to know what Congress was talking
about when it said "such section" twice. Does this
passage apply to the aggravated felony ground in the
form that it originally had in 1988—date restriction and
all? If so, that particular ground (which was new to the
law in 1988) would remain prospective as of 1988. (No
one is arguing for any earlier starting point, and so we
disregard that possibility.) Or does "such section" mean
the 1988 aggravated felony ground without the date
restriction? In that case, the date restriction on the under-
lying acts would disappear and the 1990 Act would
be fully retroactive on this point. This is, as the Eleventh
Circuit recognized, purely a question of statutory con-
struction. As the Supreme Court held in *Mulcahey v.
Catalanotte*, 353 U.S. 692 (1957), Congress has the
authority to pass a law requiring deportation regardless
of when the supporting facts took place. The question
is only what did it do in the set of statutes we are con-
sidering.

The Eleventh Circuit was persuaded by several of
the reasons that the BIA offered when it chose the

second of those interpretations—that is, full retroactivity. It thought that full retroactivity better reflected Congress's desire in 1990 to simplify the immigration laws, because this reading eliminated the need to check earlier versions. In addition, the Eleventh Circuit had already adopted this reading as it related to the former firearms ground for deportation (which appears in a different part of the Anti-Drug Abuse Act). See *Lopez-Amaro v. INS*, 25 F.3d 986 (11th Cir. 1994); see also *Lewis v. INS*, 194 F.3d 539, 545-46 (4th Cir. 1999) (also deferring to the Board's *Lettman* decision). The Eleventh Circuit rejected Lettman's argument that the firearms ground was materially different because it was amended substantively in the 1990 Act, while the aggravated felony ground was carried forward unchanged and was merely re-codified.

In *Bell v. Reno*, 218 F.3d 86 (2d Cir. 2000), the Second Circuit took a different approach to *Lettman*. It found that *Chevron* deference to the Board's view was not appropriate, writing that the Board's interpretation was "not sustainable because it runs afoul of the longstanding presumption against the retroactive application of ambiguous statutory provisions." *Id.* at 93 (citing *Landgraf*, 511 U.S. at 265). The court pointed out that in *Lettman* the Board had not conducted a retroactivity analysis under *Landgraf*. Had it done so, the court said, "it would have been compelled to conclude that § 602(c) cannot be construed to apply to convictions that pre-date the [Anti-Drug Abuse Act]," since both the majority and the dissent in *Lettman* acknowledge that the provision is ambiguous. *Id*. at 94. The Second Circuit

turned instead to the effective date provision of the 1990 Act, Section 602(d), which states that the amended definition of "aggravated felony" should apply only to deportation proceedings initiated after March 1, 1991. The court understood that language to mean that it should apply the deportation consequences to any aggravated felon no matter when the qualifying felony was committed, so long as the proceeding itself was initiated after March 1, 1991. *Id.* at 94-96.

In *Ledezma-Galicia v. Holder*, 636 F.3d 1059 (9th Cir. 2010), the Ninth Circuit rejected the approaches of both the Eleventh Circuit and the Second Circuit. There, petitioner Ledezma-Galicia was a lawful permanent resident alien. He was convicted in September 1988 of sodomy, for sexually assaulting a minor. That crime is now defined as an aggravated felony by 8 U.S.C. § 1101(a)(43)(A), and thus (putting retroactivity to one side) it currently is a ground for removal under 8 U.S.C. § 1227(a)(2)(A)(iii). But at the time Ledezma-Galicia was convicted of his state crime, he could not have been removed for that or any other aggravated felony, because this was before November 18, 1988, when the Anti-Drug Abuse Act added the category of "aggravated felony" to the INA.

The Ninth Circuit focused on two central questions: "First, did § 602 of the 1990 [Act] preserve or override [the Anti-Drug Abuse Act] § 7344(b), the [Anti-Drug Abuse Act's] temporal limitation on aggravated felony deportations? Second, if [the Anti-Drug Abuse Act] § 7344(b) survived the [1990 Act], did IIRIRA in 1996

eliminate its temporal limitation?" 636 F.3d at 1066. Like us, the Ninth Circuit recognized that *Chevron* deference does not apply to the question whether a statute should be applied retroactively. Turning to the Board's *Lettman* decision, the Ninth Circuit concluded that the Board "took a fundamentally wrong turn in its analysis" when it decided to concentrate on the "except" clause of the 1990 Act, Section 602(c). *Id.* at 1068. In the Ninth Circuit's view, whether the "except" clause referred to the pre-1990 Act or post-1990 Act version of INA Section 241(a) was of no importance. That is because Section 7344(*b*) (part of the Anti-Drug Abuse Act of 1988) was never part of Section 241 to begin with; only Section 7344(*a*) amended Section 241. That meant, the court reasoned, that Section 7344(b) "was always an entirely free-standing temporal limitation provision." *Id*. at 1069. Because Section 7344(b) was never part of 241, it was unaffected by Section 602(c)'s references to "such section." Finally, the Ninth Circuit concluded that nothing in the 1990 Act (or any other legislation) has repealed Section 7344(b), either explicitly or by implication. Indeed, the court found, repeal of Section 7344(b) would have produced odd results. *Id.* at 1072. Like the Anti-Drug Abuse Act, the 1990 Act treated the *definition* of aggravated felony as something distinct from the aggravated-felony *ground* for deportation. This made sense, because otherwise why would Section 501 of the 1990 Act have separately specified the temporal reach of the new definitions? If Section 7344(b) had been impliedly repealed by the 1990 Act, the provision in the 1990 Act itself specifying that certain of the amendments in Section 501(a) would be

effective from the date of the 1988 Anti-Drug Abuse Act would have been pointless. *Id.* at 1073. The court was also influenced in its decision by the presumptions against retroactivity and implied repeals.

IIRIRA did not affect the Board's decision in *Lettman*, because those proceedings began well before the statute's 1996 date of enactment. In *Ledezma-Galicia*, however, the Ninth Circuit had to consider its impact, because it was IIRIRA that added "sexual abuse of a minor" to the list of aggravated felonies in the INA. IIRIRA also made its amended definition applicable to all aliens, regardless of their date of conviction. As it had done earlier, the court rejected the argument that the definition automatically dictated the immigration consequences. Instead, the court found it necessary to look at the particular consequence (removal) and see if it should be applied retroactively. The court concluded that Ledezma-Galicia was not removable by reason of being an aggravated felon, because the removal provision of the statute does not apply to convictions that occurred prior to November 18, 1988.

Judge Bybee dissented from the majority's opinion, but his opening line makes a telling point. He wrote: "There is no polite way to say this: The statutory scheme we are required to parse in this case is a mess. It is a model of ambiguity and misdirection." 636 F.3d at 1080. That said, he would have deferred to the BIA's understanding of the interactions among all of these statutes and would have denied the petition for review. But Judge Bybee's statement illustrates the exact problem

that the *St. Cyr* Court identified as precluding any such deference in light of the *Landgraf* presumption against retroactivity—where the statute is admittedly "a model of ambiguity," Congress has not made the necessary clear statement of retroactive intent.

Where, then, does all of this leave Zivkovic? If we were to follow *Ledezma-Galicia,* the conclusion would be that neither his 1976 nor his 1978 conviction (each of which now falls within the definition of "aggravated felony") may form the predicate for removal, because the commission of an aggravated felony did not become a ground for removal until 1988. If, on the other hand, we were to follow the Eleventh and Fourth Circuits (which followed the Board's reasoning in *Lettman*), the result would be to say that Section 602(c) of the 1990 Act not only placed the *definition* of aggravated felony in a different part of the statute, but it also cryptically wiped away any temporal limitations on *use* of such a conviction for purposes of removal. Were we to follow the Second Circuit, we would permit the use of Zivkovic's two old felonies not because we would be deferring to the Board, but because his removal proceedings were initiated after March 1, 1991. Finally, our dissenting colleague proposes yet another approach, bypassing the 1990 Act as ambiguous but instead finding a clear rule for retroactive removability in IIRIRA.

It appears to be common ground that neither the 1990 Act nor any other statute passed after the Anti-Drug Abuse Act of 1988 has expressly repealed Section 7344(b),

the provision stating that the deportation consequences of the newly defined group of aggravated felonies operate prospectively as of the effective date of the 1988 Act. A finding of retroactivity would thus need to rest on implied repeal, a topic on which the Supreme Court provided useful guidance in *National Association of Home Builders v. Defenders of Wildlife,* 551 U.S. 644 (2007):

> While a later enacted statute (such as the [Endangered Species Act]) can sometimes operate to amend or even repeal an earlier statutory provision (such as the [Clean Water Act]), "repeals by implication are not favored" and will not be presumed unless the "intention of the legislature to repeal [is] clear and manifest." *Watt v. Alaska*, 451 U.S. 259, 267 (1981) (internal quotation marks omitted). We will not infer a statutory repeal unless the later statute 'expressly contradict[s] the original act' " or unless such a construction "is absolutely necessary . . . in order that [the] words [of the later statute] shall have any meaning at all.

*Id.* at 662 (some internal quotations omitted). We do not find any irreconcilable conflict among the Anti-Drug Abuse Act, the 1990 Act, and IIRIRA, nor did either of the later statutes comprehensively replace the underlying INA. See *Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 154 (1976). Instead, what we find is the confusion that Judge Bybee described.

Out of that mess, we can extract a number of observations.

- Section 7344(b) of the 1988 Anti-Drug Abuse Act applies only to one of many categories of deportable criminal offenses listed in the 1990 Act, which sets out thirty grounds for deportation and fourteen categories of deportable criminal offenses.

- There is no clear signal in the text of the 1990 Act indicating that it is repealing Section 7344(b) of the 1988 statute.

- When Section 7344(b) was enacted, the INA already contained a provision nearly identical to the one in the 1990 Act—that is, one that applied the INA's grounds for deportation regardless of when the facts occurred. This means that the Anti-Drug Abuse Act was creating an exception to an understood rule.

- The 1990 Act added several new crimes to the definition of "aggravated felony." It provided that three of these crimes would be grounds for deportation only if they were based on post-1990 Act convictions; the other two would be "effective as if included" in Section 7342 of the 1988 Act.

- IIRIRA also did no more than to expand the definition of aggravated felony. The new grounds it provided for deportation are of no importance to Zivkovic's case.

We conclude that the statutes are wholly unclear on the point whether Section 7344 survives both the 1990 Act and IIRIRA. As we have just pointed out, judges addressing this issue have taken four distinct and

often contradictory approaches: (1) deference to *Lettman* (Eleventh and Fourth Circuits plus Ninth Circuit dissent); (2) no deference to *Lettman,* but reliance on Section 602(d) of the 1990 Act (Second Circuit); (3) the IIRIRA amendments to 8 U.S.C. § 1101(a)(43) (dissenting judge in this case); and (4) no retroactive consequences of expanded definition for removability (Ninth Circuit majority). This level of ambiguity cannot overcome the presumptions against implied repeal and retroactivity. As the Supreme Court reminded us in *Vartelas,* because "[s]everal provisions of the Constitution . . . embrace the doctrine" against retroactivity, we need a clear statement of intent from Congress before we will take such an important step. 132 S. Ct. at 1486. Because Zivkovic's aggravated felony convictions were more than a decade old before the 1988 statute took effect, they cannot be used as a ground for removal (although they can be used for many other purposes under the statute). Before closing, we state the obvious: we are only construing the law as it now stands. Congress has broad powers in this area, and it may change the rules in the future, either prospectively or, with the necessary clear statement, retrospectively.

## V

This leaves two loose ends to tie up, one of which is relatively unimportant and the other of which is significant. Zivkovic argued that the IJ should not have considered evidence from his bond proceedings during

the removal proceedings, because the judges are supposed to maintain separate records for the two types of cases. We find no merit in this argument. The IJ is quite able to keep separate records while at the same time taking into account relevant evidence that arises in either proceeding. Zivkovic's conviction documents would have been admitted in a flash in each set of proceedings if the government had introduced them separately. We have no desire to make the system even more inefficient than it already is.

The other question relates to the proper disposition of Zivkovic's case. We are granting his petition for review, but that means only that the case will be returned to the Board for further proceedings. Earlier, the Board had no occasion to consider his removability for moral turpitude, but that ground remains in the record, and the Board may wish to remand to an IJ for further proceedings on that or other points that the government has properly preserved.

The petition for review is GRANTED and the case is returned to the Board for further proceedings consistent with this opinion.

E ASTERBROOK, *Chief Judge*, dissenting. My colleagues have written a complex opinion in a simple case. Zivkovic wants a waiver of inadmissibility under 8 U.S.C. §1182(c). He is ineligible if even one of his convictions is an "aggravated felony" as defined in 8 U.S.C. §1101(a)(43). I disregard Zivkovic's conviction for residential trespass. It is enough if either burglary or attempted rape is an "aggravated felony."

Section 1101(a)(43)(G) says that burglary is an aggravated felony if the sentence was a year or more, as Zivkovic's was. Section 1101(a)(43)(A) says that rape is an aggravated felony, and §1101(a)(43)(U) adds that "an attempt or conspiracy to commit an offense described in this paragraph" likewise is an aggravated felony. ("[T]his paragraph" refers to all of (a)(43): lettered parts of a section are "subsections" and the numbered parts of subsections are "paragraphs." See Office of the Legislative Counsel, United States Senate, *Legislative Drafting* Manual §112 (1997).) This leaves only the question whether §1101(a)(43) applies to convictions rendered during the 1970s. The answer is yes. The final, hanging sentence of §1101(a)(43) reads: "Notwithstanding any other provision of law (including any effective date), the term [aggravated felony] applies regardless of whether the conviction was entered before, on, or after September 30, 1996."

A plainer declaration of retroactivity is hard to imagine—and the Supreme Court said exactly this in *INS v. St. Cyr*, 533 U.S. 289, 295 & n.4 (2001), when stating that the definition of aggravated felonies in §1101(a)(43)

applies "without regard to how long ago they were committed." To drive the point home, the Court repeated this observation, quoting from the hanging sentence, 533 U.S. at 319 & n.43, and adding that this shows that Congress knows how to make a change retroactive. *Id*. at 320.

My colleagues today nonetheless hold that, even if the full list of "aggravated felonies" consolidated in §1101(a)(43) applies to pre-1996 convictions, those older convictions do not carry the statutorily prescribed consequences of aggravated felonies—and this despite contrary conclusions of the responsible agency, *Matter of Letterman*, 22 I&N Dec. 365 (1998) (en banc), and three other courts of appeals. *Bell v. Reno*, 218 F.3d 86 (2d Cir. 2000); *Lewis v. INS*, 194 F.3d 539, 544–46 (4th Cir. 1999); *Lettman v. Reno*, 207 F.3d 1368 (11th Cir. 2000). Today's decision follows a divided panel in the Ninth Circuit. *Ledezma-Galicia v. Holder*, 636 F.3d 1059 (9th Cir. 2010). But it is contrary to the language of §1101(a)(43), the view of the Supreme Court, and the holdings of three other circuits.

The majority opinion is so long and complex because it tries to sort out the relation among the 1988, 1990, and 1996 Acts (sometimes dubbed ADAA, IMMAct, and IIRIRA) by using tools other than the language of the statute now in force. If we want to know whether the current definition of "aggravated felony" applies to pre-1996 convictions (and thus pre-1988 and pre-1990 convictions) we need not go beyond the hanging sentence at the end of §1101(a)(43). No backstory is needed.

The presumption against retroactivity tells us how to deal with ambiguity, but the hanging sentence is pellucid. *St. Cyr* said as much. The 1988 and 1990 Acts survive in part in §1101(a)(43), but their effective dates are history; the hanging sentence tells us how the date of convictions matters today. As for "implied repeal": the 1988 Act said that *it* was not retroactive, and the 1990 Act was ambiguous about retroactivity. Neither was "repealed" by the statement in 1996 that the definition as amended *is* retroactive. The 1988 statement "this Act is not retroactive" is 100% compatible with the 1996 declaration "Ah, but *this* Act *is* retroactive." Neither modifies the other. It's not as if the 1988 Act said: "Any statute enacted later will not make these substantive changes apply to older convictions." Then the 1996 Act would have repealed that part of the 1988 Act. But that's not what happened. There is no "repeal" when a more recent Congress declares that the current definition applies whether or not the date mattered under a predecessor statute. (Recall that the hanging sentence begins: "Notwithstanding *any* other provision of law (including *any* effective date) …" (emphasis added).) Section 7344(b) of the 1988 Act, and §602 of the 1990 Act, tell us the temporal reach of those Acts; they are not part of the United States Code and do not control the temporal reach of §1101(a)(43) as amended in 1996 and later.

The hanging sentence of §1101(a)(43) decides this case. Once we conclude that the 1996 Act's changes to §212(c) apply to Zivkovic (I agree with Part IV.A of the majority's opinion), everything else becomes irrelevant.

My colleagues reach a different conclusion because they agree with *Ledezma-Galicia* that, although the *definitions* in §1101(a)(43) apply to older convictions, the *consequences* of those definitions are not necessarily retroactive. I don't get it—nor did Judge Bybee, dissenting in *Ledezma-Galicia*. 636 F.3d at 1080–92. Congress has addressed through §1101(a)(43) which criminal convictions count as aggravated felonies. Other parts of the statute specify the effects of that label. In the main, an alien convicted of an aggravated felony is removable and ineligible for discretionary relief. Particular parts of the Immigration and Nationality Act outside §1101(a)(43) may or may not be retroactive, but not because of anything in the 1988 and 1990 Acts.

The only part of immigration law plausibly limiting today's consequences of pre-1996 convictions that count as aggravated felonies under §1101(a)(43) would be §212(c), 8 U.S.C. §1182(c), the subject of *St. Cyr*. But all three members of this panel conclude that Zivkovic— whose convictions for burglary and attempted rape predate the legislation authorizing waiver of inadmissibility for such crimes, and who therefore cannot have relied on the pre-1996 version of §212(c) when making choices in the criminal prosecutions—does not get any benefit from *St. Cyr*'s limitation on how §212(c) applies to pre-1996 convictions. See Part IV.A of the majority opinion.

If §1101(a)(43) applies to all pre-1996 convictions, and §212(c) thus forecloses a waiver of inadmissibility, then what statute is it that withholds the "consequences" of

Zivkovic's conviction? My colleagues do not say, and neither did *Ledezma-Galicia*.

Our opinion in *Alvarado-Fonseca v. Holder*, 631 F.3d 385 (7th Cir. 2011), left open the possibility of distinguishing definitions from consequences, while hinting that it doubted the Ninth Circuit's hair-splitting. The panel in *Alvarado-Fonseca* refrained from a definitive conclusion, however, because the alien had failed to raise before the BIA an argument based on this elusive distinction.

The reason to get the Board's view is that its understanding of the relation among the 1988, 1990, and 1996 Acts deserves substantial weight in resolving disputes about their interaction. See *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), and, e.g., *Holder v. Martinez Gutierrez*, 132 S. Ct. 2011, 2017 (2012); *Negusie v. Holder*, 555 U.S. 511, 516–17 (2009); *INS v. Aguirre-Aguirre*, 526 U.S. 415, 424–26 (1999). To resolve Zivkovic's application for a waiver, the Board had to decide whether the 1996 decision that §1101(a)(43) applies to all older convictions leaves any room for a conclusion that some aliens who have "aggravated felonies" (thus defined) on their records nonetheless are spared the normal consequences. My colleagues think that issue cloudy and wrestle with it at length. Ambiguity in an agency's organic statute is the core of *Chevron*'s domain, and this is true even if the dispute concerns the agency's authority. *Arlington v. FCC*, 133 S. Ct. 1863 (2013).

Although my colleagues point out that the Supreme Court did not use *Chevron* when resolving retroactivity

issues in *Vartelas v. Holder*, 132 S. Ct. 1479 (2012), it was not asked to do so. Issues not presented by the parties are not resolved. *Chevron* was argued in *St. Cyr* and addressed in a footnote, 533 U.S. at 320 n.45, which observes that *Chevron* matters only when other tools do not provide an answer. That's *Chevron*'s Step One. *St. Cyr* said that the rule requiring clear language to warrant retroactivity was such a tool, leaving no gap for the agency to fill. My colleagues conclude from this that *Chevron* is irrelevant to all questions related to retroactivity. Yet the hanging sentence of §1101(a)(43), which makes the amended definition retroactive, supplies what was missing in *St. Cyr*—as the Court itself observed, 533 U.S. at 295 & n.4, 319–20 & n.43.

On my colleagues' understanding that definitions and consequences must be analyzed separately, there is a knotty question about the relation among the 1988, 1990, and 1996 Acts. *St. Cyr* does not address that subject, which concerns *Chevron*'s Step Two—and for reasons I have given is not within the scope of the presumption against retroactivity. The agency's views therefore should be respected, not thrown into the trash. Unanimous panels of three courts of appeals, one judge on the Ninth Circuit's panel, and one judge on this circuit's panel agree with the Board either after independent review or through the lens of *Chevron*; and of the four other judges (two on the Ninth Circuit and two on this circuit) none has concluded that answer is too clearly against the Board's views to admit of debate. As Judge Bybee put it: "so twisted and complex are the provisions at issue here that—short of spitting in a

bucket—the BIA could have concluded almost anything in this case and been reasonable. There is nothing 'plain' about these statutes. If *Chevron* means anything, this is a classic case for deferring to the agency." 636 F.3d at 1080–81 (dissenting opinion). And if *Chevron* falls out, we still have *Mead-Skidmore* deference. See *United States v. Mead Corp.*, 533 U.S. 218 (2001); *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). Yet my colleagues give the Board's views *no* weight. If (as I doubt) there is a distinction between definitions and consequences, the Board's views should prevail.