In the

# United States Court of Appeals
## For the Seventh Circuit

No. 11-2381

EMERGENCY SERVICES BILLING CORPORATION, INC.,
individually (and as agent for) agent of
Westville Volunteer Fire Department,

*Plaintiff-Appellant,*

*v.*

ALLSTATE INSURANCE COMPANY, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division at Lafayette.
No. 4:09-cv-00045-JD-APR—**Jon E. DeGuilio**, *Judge*.

ARGUED NOVEMBER 1, 2011—DECIDED FEBRUARY 2, 2012

Before BAUER, FLAUM, and SYKES, *Circuit Judges*.

FLAUM, *Circuit Judge*. This appeal concerns the interpretation of the phrase "consumer product in consumer use" in the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). 42 U.S.C. §§ 9601 et seq. Plaintiff-appellant, Emergency Services Billing Corporation ("ESBC"), is the billing agent for the

Volunteer Fire Department of Westville ("Fire Department"), a town in central Indiana. ESBC brought this action against individuals who were involved in motor vehicle accidents and the insurance companies that represent those individuals. Under CERCLA, the owner of a "facility" from which hazardous substances have been released is responsible for the response costs that result from the release. ESBC believes that personally-owned motor vehicles fall within the definition of "facilities" under CERCLA. Thus, ESBC charged the individual defendants, and therefore the insurance company defendants, with the response costs relating to their respective car accidents. Defendants argue that personal motor vehicles fall under CERCLA's "consumer product in consumer use" exception to the definition of "facilities," and they have refused to pay ESBC for the response costs. ESBC has asked for declaratory relief in the form of a confirmation of the defendants' liability under CERCLA.

The district court held that motor vehicles for personal use do, in fact, fall under the "consumer product in consumer use" exception to CERCLA's definition of facility, and that defendants cannot be charged with the Fire Department's costs for responding to the car accidents. ESBC appeals, challenging the district court's interpretation of CERCLA. For the following reasons, we affirm the district court's dismissal of ESBC's suit.

## I. Background

The facts of this case are few and are not in dispute. This case involves response costs that the Fire Department

incurred in responding to four separate motor vehicle accidents. Defendants David Penton, Juan Jose Gomez Hernandez, Frank Dubczak, and Michael Baker each owned a vehicle that was involved in a car accident in LaPorte County, Indiana. Defendants Dubczak and Penton are insured by Progressive Insurance Company, defendant Baker is insured by Allstate Insurance Company, and defendant Hernandez is insured by State Farm Insurance Company. Each insurance company is a defendant in this suit as well. ESBC, as billing agent for the Fire Department, determined that each of the individual defendants was the owner of a vehicle involved in a collision that the Fire Department responded to, and that each of the defendants had liability insurance coverage. ESBC therefore provided invoices itemizing the response costs incurred by the Fire Department for each collision. The defendants, however, refused to pay those costs.

In response to defendants' refusal to pay, ESBC brought this declaratory action, asking the court to affirm that defendants are liable for response costs under CERCLA. Defendants filed answers and denied liability. Allstate and Baker also filed counterclaims against ESBC seeking injunctive relief from ESBC's billing practices and alleging claims for violation of the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692, et seq., unjust enrichment, unlawful fee collection, fraud, constructive fraud, and insurance fraud.

State Farm eventually filed a motion for judgment on the pleadings according to Rule 12(c) of the Federal Rules

of Civil Procedure. All defendants joined the motion. Defendant/counter-plaintiff Allstate also filed a motion for a preliminary injunction regarding ESBC's mailing of invoices and a motion for a hearing regarding the preliminary injunction. The district court granted defendants' motion for judgment on the pleadings, rendering Allstate's motions moot. In response to this ruling, ESBC filed a Rule 59(e) motion to alter or amend the judgment, which was denied.

For purposes of appellate jurisdiction, Allstate and Baker stipulated to the dismissal of their remaining counterclaims without prejudice. The district court construed that stipulation as a motion, and granted their motion to dismiss without prejudice. Given that all claims had therefore been dismissed, the court dismissed Allstate and Baker's entire case without prejudice. ESBC appealed the district court's judgment on the pleadings, but we questioned our jurisdiction over that ruling given the fact that the counterclaims were not dismissed with prejudice. ESBC therefore dismissed their appeal voluntarily and asked the district court for a Rule 54(b) entry of judgment, which would permit ESBC to appeal the court's dismissal of its suit before Allstate's countersuit was finally resolved. Fed. R. Civ. P. 54(b). The district court granted the Rule 54(b) motion, and the appeal is now properly before us.

## II. Discussion

CERCLA was established by Congress to "provide for liability, compensation, cleanup, and emergency response

for hazardous substances released into the environment and the cleanup of inactive hazardous waste disposal sites." CERCLA, Pub. L. No. 96-510, 94 Stat. 2767 (1980). CERCLA imposes liability for "response costs" on the "owner and operator of a . . . facility" from which a hazardous substance has been released. 42 U.S.C. § 9607(a)(1)-(4). *See also Amcast Industrial Corp. v. Detrex Corp.*, 2 F.3d 746, 748 (7th Cir. 1993). Responders to situations involving hazardous materials can therefore bring private cost-recovery actions against facility owners responsible for the release of hazardous materials. *Id*. In order to succeed in an action for recovery of response costs under CERCLA, a plaintiff must prove the following elements: "(1) the site in question is a 'facility' as defined by CERCLA; (2) the defendant is a 'responsible person' for the spill as defined by CERCLA; (3) there was a release of hazardous substances; and (4) such release caused the Plaintiff to incur response costs." *Envtl. Transp. Sys., Inc, v. Ensco, Inc.*, 969 F.2d 503, 506 (7th Cir. 1992). The only prong at issue in this appeal is the first prong: whether the motor vehicles at issue constitute "facilities" for the purposes of CERCLA liability. CERCLA defines "facility" as follows:

> The term "facility" means (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, *motor vehicle*, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does

not include any consumer product in consumer use or any vessel.

42 U.S.C. § 9601(9) (emphasis added). Section 9601(9)(A) clearly contemplates that motor vehicles are facilities for the purposes of CERCLA. Section B, however, excludes "consumer product[s] in consumer use" from the definition of facility. The question, therefore, is whether a motor vehicle owned for personal use is a "consumer product in consumer use" under CERCLA.

The district court held that defendants' motor vehicles fall under the consumer products exception, and thus CERCLA response costs cannot be recovered by ESBC. We review a district court's ruling on a Rule 12(c) motion de novo. *Buchanan-Moore v. Cnty. of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009). As with Rule 12(b)(6) motions, we must view the facts alleged in the light most favorable to the non-moving party. *N. Ind. Gun & Outdoor Shows Inc. v. City of South Bend*, 163 F.3d 449, 452 (7th Cir. 1998).

ESBC argues that motor vehicles do not fall under the consumer product exception to facilities even if they are being used by individuals for personal use. In support of this contention, ESBC maintains that the phrase "consumer product" is ambiguous as it is used here, and thus we must look outside the statute to determine its meaning. Under *Chevron v. Natural Res. Def. Council Inc.*, if a statutory term is ambiguous and there is an agency that administers the statute in question, courts must defer to the administering agency's interpretation of the ambiguous term. 467 U.S. 837, 843-44

(1984). ESBC argues that the Environmental Protection Agency's (the "EPA") interpretation of CERCLA should control since the EPA administers CERCLA. ESBC further maintains that the EPA's interpretation of the term "consumer product" does not include motor vehicles, and thus personal motor vehicles must be considered "facilities" under CERCLA.

Defendants disagree. They argue that the term "consumer product" as it is used in CERCLA unambiguously includes personal motor vehicles, and that any reference to interpretive tools outside the statute itself, including the EPA's interpretation, is inappropriate. Defendants also argue that the inclusion of motor vehicles in the definition of "consumer product" is consistent with the purposes of CERCLA. Defendants further maintain that sources outside of CERCLA, even if considered, actually bolster the position for which they advocate. Finally, defendants argue that the EPA's definition of "consumer product" is not actually inconsistent with the district court's holding.

We find the defendants' interpretation of "consumer product" persuasive. We therefore hold that motor vehicles can be "consumer products in consumer use" for the purposes of CERCLA, and thus owners/operators of personal motor vehicles are exempt from CERCLA's response-cost provisions.

## A. Waiver

As an initial matter, defendants argue that ESBC waived any argument that the term "consumer product"

is ambiguous by not raising this point until its motion for reconsideration. While defendants are correct that ESBC did not use the term "ambiguous" until its Motion for Reconsideration, ESBC did argue against dismissal by referring to sources outside of CERCLA in attempting to advance its interpretation of "consumer product"—an argument that could only succeed if the court found that the statute's plain language is ambiguous. Further, the district court discussed whether "consumer product" is ambiguous as it is used in CERCLA in its order dismissing ESBC's case. Given that this is a matter that does not require a rich factual record, as well as the fact that the district court amply covered the issue of ambiguity, this case falls under *Bailey v. International Brotherhood of Boilermakers*, in which we held that if "a party has presented a skeletal argument below, which the district court recognized and addressed, and which the party has now fleshed out and emphasized on appeal," we can find that the party has not waived the argument. 175 F.3d 526, 529-30 (7th Cir. 1999).

## B.  "Consumer Product in Consumer Use"

When interpreting any statute, we begin with the statutory language itself and assume that the plain meaning, if easily ascertained, adequately expresses the intent of the legislature. *Grzan v. Charter Hospital of Northwest Indiana*, 104 F.3d 116, 122 (7th Cir. 1997). In determining whether the statutory language is clear or ambiguous, we are to consider "the language itself, the specific context in which that language is used, and the broader

context of the statute as a whole," *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997), and reference to dictionary definitions is appropriate. *Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1571 (Fed. Cir. 1994). When the plain meaning of a statutory term is unclear, outside considerations can be used in an attempt to glean the legislative intent behind the use of the term. *See Firstar Bank v. Faul*, 253 F.3d 982, 987-90 (7th Cir. 2001). These can include the legislative history, *Koyo Seiko*, 36 F.3d at 1571, and reference to the same term's use in other statutes. *Firstar*, 253 F.3d at 990.

In the context of a statute that is administered by an agency, these tools of construction still have a place, *see Bankers Life and Cas. Co. v. United States*, 142 F.3d 973, 983 (7th Cir. 1998), but deference must be given to an agency's interpretation of its own statute if that statute has a gap—that is, if a key term is ambiguous and Congress was silent as to its meaning. *Chevron*, 467 U.S. at 843. The framework established in *Chevron* is generally broken down into two steps. The first step is the determination of whether Congress has spoken on a statutory ambiguity in dispute. *Bankers Life*, 142 F.3d at 983. Courts differ on the amount of analysis they are willing to conduct under *Chevron*'s first step. *Compare Square D Co. and Subsidiaries v. C.I.R.*, 438 F.3d 739, 745 n. 4 (7th Cir. 2006) ("[W]e do not share [appellant's] enthusiasm for determining whether relevant provisions have a clear and plain meaning by wandering outside the actual statutory language and into the legislative history in the first step of the *Chevron* analysis.") *with Salman Ranch, Ltd. v. C.I.R.*, 647 F.3d 929, 937 (10th Cir.

2011) (stating that both statutory language and statutory history are appropriate considerations in conducting step one of the *Chevron* analysis). In this Circuit, "we seem to lean toward reserving consideration of legislative history and other appropriate factors until the second *Chevron* step." *Bankers Life*, 142 F.3d at 983. Thus, the only questions we must answer in the first step of *Chevron* are whether the statutory language to be interpreted, on its face, is ambiguous, and whether Congress was silent regarding that ambiguity. If the answer to both of these questions is yes, then we must turn to the administering agency's interpretation of that language. *Id*.

Under the second step of *Chevron*, an agency's interpretation of the statute it administers is afforded deference. *Id*. If that interpretation is reasonable, it must be followed, regardless of whether or not the reviewing court would have come to the same conclusion. *Chevron*, 467 U.S. at 843 n. 11. It is at this point that we view the agency's interpretation in light of the legislative history, the purpose of the statute, and comparative statutes in order to determine whether the agency's interpretation is reasonable. *Bankers Life*, 142 F.3d at 983.

Applied to this case, step 1 of the *Chevron* analysis requires us to determine whether the term "consumer product," as used in CERCLA, is ambiguous, and if so, whether Congress resolved the ambiguity with other statutory language. To start, the term "consumer product" is not found in the definitions section of CERCLA. *See* 42 U.S.C. § 9601. ESBC claims that this is dispositive—Congress was silent as to the meaning of

"consumer product," so we must turn to the EPA's definition. "[T]he lack of a statutory definition," however, "does not render a term ambiguous." *American Fed'n of Gov't Employees v. Glickman*, 215 F.3d 7, 10 (D.C. Cir. 2000). The district court initially held that the dictionary definition of "consumer product" is clear and applicable, and thus the phrase is unambiguous and no further inquiry is necessary. The court cited Black's Law Dictionary as defining "consumer product" as "[a]n item of personal property that is distributed in commerce and is normally used for personal, family, or household purposes." 359 (9th ed. 2009).[1] Since a personal motor

---

[1] The district court also compared the use of the term "consumer product" in CERCLA to its use in the Magnuson-Moss Warranty Act (to which Black's Law Dictionary cites), which defines "consumer product" as "any tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes." 15 U.S.C. § 2301(1). Using the Magnuson-Moss Act's definition, the district court reasoned that "a personally owned vehicle, or an instrument of transportation or conveyance, is an item of tangible personal property distributed in commerce, and, when normally used for personal purposes, it fits within the ordinary meaning of 'consumer product.'" For further support, the district court cited *Stoebner Motors, Inc. v. Automobili Lamborghini S.P.A.*, in which a district court held that motor vehicles fall under the definition of consumer product in the Magnuson-Moss Warranty Act. 459 F.Supp.2d 1028 (D. Haw. 2006). While these points are persuasive, our case law concerning the *Chevron* framework suggests that the district

(continued...)

vehicle is undoubtedly "distributed in commerce" and is used for "personal, family, or household purposes," defendants argue that the term "consumer product in consumer use" is unambiguous as it applies to motor vehicles, and we should end our analysis at this point.

In response, ESBC cites the Consumer Product Safety Act (the "CPSA"), 15 U.S.C. §§ 2051-2089, and the Magnuson-Moss Warranty Act (the "Magnuson-Moss Act"), 15 U.S.C. § 2301-2312, to defend its position that "consumer product" is an ambiguous term. ESBC argues that "consumer product" has been defined in two different, mutually exclusive ways by Congress in these statutes, and thus the term could not possibly be unambiguous. ESBC first cites the Magnuson-Moss Act discussed by the district court, *see supra*, note 1, which, according to the district court's reasoning, clearly includes motor vehicles. ESBC next cites the definition given in the CPSA, which explicitly excludes motor vehicles from its definition. *See* 15 U.S.C. § 2052(a)(5)(C). Given that motor vehicles can be considered "consumer products" under one statute and cannot be considered "consumer products" under another, the phrase, ESBC argues, is ambiguous.

Again, reference to outside statutes is generally reserved for the second step in the *Chevron* framework. Here, however, ESBC is using the definitions of "con-

---

[1] (...continued)

court's use of interpretive tools that consider sources outside the language of CERCLA is better suited for a step two analysis.

sumer product" found in other statutes not to advocate for the acceptance of a given definition (at this point, anyway), but rather to illustrate that the term can have two different meanings, thus rendering it ambiguous. Regardless of whether we consider ESBC's extra-statutory argument at this juncture or in a step two analysis, the argument does not succeed. Contrary to ESBC's assertions, the Magnuson-Moss Act and the CPSA are not in conflict regarding their respective definitions of the term "consumer product," and therefore do not evidence an ambiguity. True, the CPSA explicitly excludes motor vehicles from the definition of "consumer product." 15 U.S.C. § 2052(a)(5)(C). But before excluding motor vehicles from its definition, the CPSA provides the general definition of "consumer product," which states:

> The term "consumer product" means any article, or component part thereof, produced or distributed (i) for sale to a consumer for use in or around a permanent or temporary household or residence, a school, in recreation, or otherwise, or (ii) for the personal use, consumption or enjoyment of a consumer in or around a permanent or temporary household or residence, a school, in recreation, or otherwise . . . .

15 U.S.C. § 2052(a)(5). Immediately following this general definition, the CPSA excludes several items from the category of "consumer products," not because they do not meet the terms of the general definition, but because they are already regulated by different agencies or different statutes. For instance, in the CPSA, motor vehicles are excluded from "consumer products," and the term

"motor vehicle" is defined by cross-referencing the Motor Vehicle Safety Act. 15 U.S.C. § 2052; 49 U.S.C. § 30102. If the Consumer Product Safety Commission (the "CPSC")—the agency established by the CPSA—promulgates regulations regarding the manufacture and sale of motor vehicles, those regulations could conflict with the regulations already established in the Motor Vehicle Safety Act. The reason for the exclusion, therefore, is to avoid conflicting regulations of the same products or conflicting regulations of the same primary behavior. *See also* 15 U.S.C. § 2052(a)(5)(D) (excluding pesticides from the definition of "consumer product" in the CPSA as defined by the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. §§ 136 et seq.). Thus, the exclusion of motor vehicles from the CPSA's definition for "consumer product" does not illustrate the ambiguity of the term; it does the very opposite. The need to exclude motor vehicles from the definition illustrates the fact that under normal circumstances, motor vehicles for personal use constitute consumer products. This reasoning is bolstered by a Fifth Circuit case, which reasoned that "Congress has chosen to give the term [consumer product] very similar definitions in other federal statutes." *Uniroyal Chem. Co. v. Deltech Corp.*, 160 F.3d 238, 255-56 (5th Cir. 1998) (citing four statutes that give "consumer product" a similar definition, including the CPSA and the Magnuson-Moss Act).

For these reasons, the district court correctly concluded that the term "consumer product" is unambiguous as it is used in CERCLA, and personal motor vehicles in personal use fall within its scope. However, even if,

arguendo, the term "consumer product" is ambiguous as it is used in CERCLA, a look to outside sources confirm that motor vehicles for personal use do, in fact, belong under the "consumer product" exemption from "facilities" as defined in CERCLA.

Under step two of the *Chevron* framework, an executive agency's interpretation of an ambiguous statutory term is controlling if that agency administers the statute in question and the agency's interpretation is reasonable. *See generally* 467 U.S. 837. *See also Wisconsin Electric Power Co. v. Reilly*, 893 F.2d 901, 907 (7th Cir. 1990) ("When a court reviews an agency's construction of the statute which it administers . . . [and] the statute is silent or ambiguous . . . the question for the court is whether the agency's answer is based on a permissible construction of the statute."). The EPA is the agency that administers CERCLA, *Uniroyal Chem. Co.*, 160 F.3d at 250, and it has discussed its interpretation of the term "consumer product" in a regulation, which states, "Consumer product shall have the meaning stated in 15 U.S.C. 2052[, the definitions section of the CPSA]." 40 C.F.R. § 302.3 (2009). By way of review, the CPSA defines "consumer product" as follows:

> The term "consumer product" means any article, or component part thereof, produced or distributed (i) for sale to a consumer for use in or around a permanent or temporary household or residence, a school, in recreation, or otherwise, or (ii) for the personal use, consumption or enjoyment of a consumer in or around a permanent or temporary household or

residence, a school, in recreation, or otherwise; but such term does not include—

. . .

(C) motor vehicles or motor vehicle equipment (as defined by section 30102(a)(6) and (7) of Title 49)[2].

15 U.S.C. § 2052(a)(5). ESBC argues that since motor vehicles are excluded from the definition of "consumer product" under the CPSA, and the EPA interpreted "consumer product" to have the same meaning in CERCLA as it does in the CPSA, motor vehicles should be excluded from the definition of "consumer product," and thus should *not* be excluded from CERCLA's provisions concerning "facilities." The defendants, on the other hand, argue that the general definition of "consumer product" alone is what the EPA was referring to, and not the several exclusions listed.

ESBC's argument is misleading. CERCLA serves many functions, and one of those functions, at issue in this case, is to hold the owners of facilities responsible for response costs when the facilities in question emit hazardous substances. *See* 42 U.S.C. § 9607. Another purpose of CERCLA, however, is to impose notification requirements on owners of facilities that leak hazardous substances. *See* 42 U.S.C. § 9603. The EPA regulation cited by ESBC defines "consumer product" solely for the sections of CERCLA concerning facility owners'

---

[2]  49 U.S.C. § 30102 is the definitions section of the Motor Vehicle Safety Act.

notification requirements, not the cost-recovery provisions. *See* 40 C.F.R. § 302.3 ("*As used in this part*, all terms shall have the meaning set forth below . . . ." (emphasis added)). This is made clear in the EPA's original notice of proposed rules concerning the CERCLA regulation cited by ESBC, 48 Fed. Reg. 23552-01, 23553 (May 25, 1983), which was published pursuant to the EPA's notice and comment requirements for the adoption of regulations. 5 U.S.C. § 564. The relevant portions of that notice only concerned the notification requirements under CERCLA, and stated that "nothing in this proposal should be interpreted as reflecting Agency policy or the applicable law with respect to other provisions of [CERCLA]." 48 Fed. Reg. 23552-01, 23553. Thus, the EPA's acceptance of the definition of "consumer product" found in the CPSA has no bearing on that term's definition in this cost-recovery action.

In addition, even if we presume that the EPA intended for their definition of "consumer product" to apply to the case at hand, ESBC's interpretation of the EPA's regulation is unreasonable. The EPA's preliminary rule regarding the definition of "consumer product," found in the notice of proposed rules discussed above, states:

> Although the Act does not define the term "consumer product," the Consumer Product Safety Act defines that term as, *generally*, any article sold to a consumer for the person's use, consumption or enjoyment in or around a household, residence, school, in recreation, or otherwise (15 U.S.C. 2052). This definition will apply for notification under CERCLA.

48 Fed. Reg. 23552-01, 23553 (emphasis added). The EPA's use of the word "generally," along with the lack of any reference to the exclusions that follow the CPSA's general definition, suggest that the EPA did not intend for the CPSA exclusions to apply under CERCLA. ESBC correctly argues that proposed rules are not entitled to any deference. *Clay v. Johnson*, 264 F.3d 744, 750 (7th Cir. 2001). But the preliminary rule states that the definition discussed "will apply." 48 Fed. Reg. 23552-01, 23553. ESBC provides no evidence that the EPA decided to alter its course between the preliminary rule stage and the final rule stage. Nor does it discuss any comments made to the EPA on the subject during the notice and comment stage of this particular regulation. Further, the final rule can very easily be read as consistent with the proposed rule; indeed, the final rule appears to be a simplified, shortened version. The proposed rule, to the extent that it should be considered in this cost-recovery context, suggests that the CPSA's "consumer product" exclusions should not be imported to CERCLA.

ESBC next argues that since the EPA referenced the entirety of § 2052 in its regulation, the exclusions must be included in the definition of "consumer product" under CERCLA, since the exclusions are contained within § 2052. This interpretation is supported, ESBC contends, by the fact that the EPA decided to drop the use of the word "generally" from its preliminary rule when publishing its final rule. *Compare* 40 C.F.R. § 302.3 ("Consumer product shall have the meaning stated in 15 U.S.C. 2052.") *with* 48 Fed. Reg. 23552-01, 23553 ("[T]he Consumer Product Safety Act defines that term as, *gener-*

*ally*, any article sold to a consumer for the person's use . . . ." (emphasis added)). While ESBC is correct that the entirety of § 2052 is cited in the final rule (which includes the motor vehicle exclusion), the very same citation is used in the preliminary rule, in which the EPA refers to the CPSA's definition *generally*. Further, § 2052 does not just include the definition for "consumer product"; it includes all the definitions for the CPSA. The EPA clearly did not mean for us to look to the definition of "Third-party logistics provider," for instance, in seeking guidance while interpreting CERCLA. Yet the definition of that term can be found in § 2052. 15 U.S.C. § 2052(a)(16). Thus, we should not read into the fact that the EPA cited the entirety of § 2052 instead of the particular clause where the general definition of "consumer product" is found. The exclusions that accompany the motor vehicle carve out in the CPSA's definition of "consumer product" are also instructive. Beyond motor vehicles, the CPSA excludes, inter alia, tobacco, pesticides, drugs, and food from the definition of "consumer product." None of these products could be considered "facilities" even without CERCLA's consumer product exception, so their exclusion from the definition of "consumer product" would make little sense. Lastly, if the EPA meant for the exclusions found in the CPSA to be included in CERCLA, it would be very strange and misleading to directly quote the CPSA's general definition of "consumer products" in its preliminary rule but fail to mention or directly cite the motor vehicle exclusion at any point, despite the large and non-intuitive impact that the ex-

clusion would have. We therefore conclude that the EPA did not intend for the exclusions found in the CPSA to apply to the definition of "consumer product" in CERCLA.

Finally, even assuming that the EPA did, in fact, intend to include the CPSA's "consumer product" exclusions in its interpretation of "consumer product" under CERCLA, their interpretation would be unreasonable. As defendants point out, the legislative history indicates that the purpose of the consumer product exception was to immunize all consumers using consumer products from liability under CERCLA. The defendants note that the sponsor of the amendment that resulted in the consumer products exception had this to say about the bill:

> [The bill] contains no exclusions for consumer products. Therefore, it has been suggested that this would mean that an individual consumer is subject to strict, joint and several liability for a "release" from any product that contains one of the numerous hazardous substances . . . . While staff has been informed that such a result was not intended, the term "facility" as it is presently defined would include consumer products, and the report does not in any way clarify that this term does not include consumer products. An amendment will be offered to clarify this matter.

126 Cong. Rec. S12,917 (daily ed. Sept. 18, 1980) (Statement of Sen. Howard W. Cannon). Senator Cannon later said that the amendment "preclude[s] any unintended applica-

tion of notification requirements and liability provisions to consumers." 126 Cong. Rec. S13,364 (daily ed. Sept. 24, 1980) (Statement of Howard W. Cannon). The purpose of the exclusion, therefore, is clearly to prevent consumers—*all* consumers—from being held liable under CERCLA, despite ESBC's claims that this broad remedial scheme must cover car accidents. ESBC offers no support from CERCLA's legislative history that a category as large as personal motor vehicles should be excluded from the definition of consumer products, nor can we think of a reason for this exclusion.

## III. Conclusion

CERCLA's "consumer product" exemption from the term "facilities" cannot reasonably be read to exclude personally-owned, personally-operated motor vehicles. The language of CERCLA is clear on its face, and a look into CERCLA's legislative history, the term "consumer product" as it is used in other statutes, and the EPA's interpretation of the term only confirms our conclusion. We therefore AFFIRM the district court's dismissal of ESBC's suit for declaratory relief.