In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-2610

JORGE ARGENIS VELÁSQUEZ-GARCÍA,

*Petitioner,*

*v.*

ERIC H. HOLDER, JR.,
Attorney General of the United States,

*Respondent.*

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A 097 563 851

ARGUED FEBRUARY 10, 2014 — DECIDED JULY 23, 2014

Before WOOD, *Chief Judge*, HAMILTON, *Circuit Judge*, and
KENDALL, *District Judge*.[*]

WOOD, *Chief Judge*. The Child Status Protection Act, 8
U.S.C. § 1153(h) (the Act), allows the adult children of lawful
permanent residents to maintain child status if their parent

---

[*] Honorable Virginia M. Kendall, District Judge of the United States District Court for the Northern District of Illinois, sitting by designation.

filed a visa petition on their behalf while they were still un-
der 21. This provision, enacted in 2002, prevents such chil-
dren from "aging out" of visa priority during the years in
which their petition is under review by immigration authori-
ties. But an immigrant may take advantage of this provision
only if he "sought to acquire the status of an alien lawfully
admitted for permanent residence within one year" of his
visa number becoming available. *Id*. § 1153(h)(1)(A).

Jorge Argenis Velásquez-García (Velásquez) is the adult
child of a lawful permanent resident. In 2005, when Velás-
quez was 17, his father filed a visa petition on his behalf. For
our purposes, Velásquez's visa number became available in
March 2011. Although Velásquez took some steps to acquire
permanent-resident status within one year of that date, he
did not file a formal application for permanent status until
May 2012, fourteen months after his visa number became
available. Later yet, the Board of Immigration Appeals
adopted a new rule in a case called *Matter of O. Vasquez*; the
new rule required an immigrant to file or attempt to file a
substantially complete application for permanent status
within one year in order to satisfy the "sought to acquire"
prerequisite of 8 U.S.C. § 1153(h)(1)(A). Because Velásquez
had not done so, the Board found that he failed to meet the
requirement and ordered him removed.

Although we find the Board's new interpretation of the
Act's ambiguous language to be reasonable, we conclude
that retroactive application of the new one-year filing rule
works a manifest injustice in Velásquez's case. We therefore
remand to the Board for redetermination under the statutory
interpretation in effect prior to the *O. Vasquez* decision.

**I**

Velásquez, born in Mexico in 1987, entered the United States without being admitted or paroled in 1994 when he was seven years old. In 2001, Velásquez's father, a lawful permanent resident, filed on his behalf a Form I-130 petition, which seeks approval for eligible family members to apply for an immigrant visa or adjustment of residence status. Although properly filed, that petition was later deemed abandoned, unbeknownst to Velásquez or his father. In 2005, when Velásquez was 17 years old, his father filed another I-130 petition on his behalf. That petition was approved in 2009 when Velásquez was 22 years old. Approval put Velásquez in line to apply for permanent residence, which he could do only when an immigrant visa number became available to him.

Velásquez's visa number became available on March 1, 2011 (after a period of visa "retrogression" that is irrelevant for our purposes, see Visa Retrogression, U.S. Citizenship & Immigration Services (June 14, 2011) http://www.uscis.gov/green-card/green-card-processes-and-procedures/visa-availability-priority-dates/visa-retrogression) (last visited July 23, 2014)). About two weeks later, Velásquez visited an attorney to inquire about his status and to inform the attorney that he wanted to apply for his "green card." A week later, Velásquez retained the attorney to investigate his eligibility for permanent residence. The attorney filed a Freedom of Information Act (FOIA) request with the U.S. Citizenship & Immigration Services (CIS), seeking information about "[a]ll I-130 applications and approval notices" relating to Velásquez. Six months later, in September 2011, CIS sent the

attorney documents indicating that Velásquez's first I-130 petition had been "denied due to abandonment." The abandoned petition was nevertheless important because it enabled Velásquez to qualify for certain amnesty provisions enacted in the 2006 amendments to the immigration laws. See 8 U.S.C. § 1255(i). CIS's response did not mention that Velásquez had only months left to apply for permanent status before losing priority as a resident's child.

After receiving the FOIA response, the attorney met with Velásquez to discuss adjusting his status. But according to the attorney, "nothing became more solid or concrete." Velásquez later told an immigration judge that he intended to apply for permanent status, but he was "just trying to get the money together" to pay the myriad costs and fees associated with changing status. No one informed either Velásquez or his father about any filing deadline, for reasons we detail below. Meanwhile, Velásquez caught the attention of immigration officials as the result of two misdemeanor infractions: a conviction in 2007, at the age of 20, for simple possession of marijuana, and a guilty plea in January 2012 to a charge of driving under the influence (DUI), for which he served 15 days in county jail.

Upon his release from jail on February 15, 2012, Velásquez was immediately taken into immigration custody and served with a Notice to Appear for removal proceedings. The Notice to Appear was filed with the immigration court on March 8. It charged that he was removable as an alien convicted of a controlled-substance offense and as an alien present in the country without being admitted or paroled. Velásquez did not contest the grounds for his removability. In late February, Velásquez's retained counsel unsuccessfully

requested his release on bond. At the first hearing in immigration court on April 19, the judge set a May 17 deadline for Velásquez to file an application for permanent status. Velásquez filed the application on May 10, a week before the court-imposed deadline but about fourteen months after his visa number became available.

On June 8, 2012, more than three months after Velásquez's one-year statutory deadline had passed, the Board of Immigration Appeals decided *Matter of O. Vasquez*, 25 I&N Dec. 817 (B.I.A. 2012). The Board's decision in *O. Vasquez* narrowly interpreted critical language in the Act—whether the alien "sought to acquire" within one year the status of a person lawfully admitted for permanent residence—to require that an immigrant make a fully compliant application for permanent residence or one with only technical defects within one year, unless exceptional circumstances prevented the immigrant from filing such an application. This decision departed sharply from three prior non-precedential Board decisions, which had required only a showing that the immigrant took "substantial steps" to acquire permanent status in order to qualify for the Act's protection. See *In re Murillo,* No. A099 252 007, 2010 WL 5888675 (B.I.A. Oct. 6, 2010); *In re Castillo-Bonilla,* No. A98 282 359, 2008 WL 4146759 (B.I.A. Aug. 20, 2008); *In re Ji Young Kim,* No. A77 828 503, 2004 WL 3187209 (B.I.A. Dec. 20, 2004). The Eleventh Circuit (the only court of appeals to consider these decisions) elected to follow their approach in *Tovar v. U.S. Att'y Gen.*, 646 F.3d 1300, 1304–05 (11th Cir. 2011).

## II

Referring to the *O. Vasquez* decision, the immigration judge determined that Velásquez failed to meet the Child

Status Act's "sought to acquire" prerequisite because he did not file an application for permanent residence during the one-year window. On remand from the Board, the immigration judge found that Velásquez's incarceration and pending removal proceedings were not extraordinary circumstances that excused his late filing. Velásquez was ordered to be removed to Mexico, where he had not lived since he was seven years old. The removal order became final on June 25, 2013, when the Board dismissed Velásquez's appeal. Velásquez then petitioned for review of the order in this court.

Velásquez, along with the American Immigration Council as *amicus curiae*, attacks the Board's decision in *O. Vasquez* on a number of fronts. While they make some good points, we do not approach the question on a clean slate. In light of the deference we owe the Board's interpretation of ambiguous immigration statutes, we must uphold the Board's reading of the statute if it meets the criteria established in *Chevron USA, Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). Yet even if *O. Vasquez* is entitled to *Chevron* deference, we are not finished. Such a conclusion would require us to resolve the distinct question whether the *O. Vasquez* one-year filing rule must be applied retroactively. We now turn to those two inquiries.

**III**

*Chevron* requires us to defer when a statute is ambiguous and the agency charged with administering the statute promulgates a reasonable interpretation using sufficiently formal procedures. *Arobelidze v. Holder*, 653 F.3d 513, 518–19 (7th Cir. 2011). The Board is considered an agency in charge of administering the Immigration and Naturalization Act (INA). *Zivkovic v. Holder*, 724 F.3d 894, 897 (7th Cir. 2013). As

the Child Status Protection Act is an amendment to the INA, "the [Board] is entitled to deference in interpreting [its] ambiguous provisions." *Negusie v. Holder*, 555 U.S. 511, 516 (2009); see also *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) ("[T]he [Board] should be accorded *Chevron* deference as it gives ambiguous statutory terms concrete meaning through a process of case-by-case adjudication[.]") (internal quotation omitted). Even so, we must "reject administrative constructions which are contrary to clear congressional intent." *Chevron*, 467 U.S. at 843 n.9.

Velásquez's opening position is that the phrase "sought to acquire" in the Act is unambiguous. But exactly how an immigrant must seek to acquire the status of a permanent resident within one year of eligibility is not clear from the statute. Which of the following, for example, constitutes "seeking to acquire" permanent status: hiring an attorney, consulting an attorney, earning money to pay for the application, contacting immigration officials about one's status, telling an acquaintance about one's intent to seek permanent status, telling an official about one's intent, mailing in a complete application, mailing in an application in which a signature line was left blank, or providing an attorney with a completed application? The statute does not say whether these or myriad other actions would be sufficient. Congress left it up to the agency to decide what suffices to demonstrate that the alien has sought to acquire permanent status. When a statute contains "any gap left, implicitly or explicitly, by Congress, the courts must respect the interpretation of the agency to which Congress has delegated the responsibility for administering the statutory program." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 448 (1987) (internal quotation omitted).

The phrase "sought to acquire" is not a term with a well-established legal significance. *Cf. Morissette v. United States*, 342 U.S. 246, 250 (1952) ("[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey in the judicial mind unless otherwise instructed."). Variants of the phrase appear here and there in the U.S. Code, but we cannot discern any consistent meaning among them. *E.g.*, 7 U.S.C. § 3362(b)(3); 16 U.S.C. § 396f; 50 U.S.C. § 2367(b)(5). We thus find no fault in the Board's conclusion that the phrase "sought to acquire" is "*sui generis* in the Act and is not a legal term of art in applicable regulations or administrative or judicial decisions." *O. Vasquez*, 25 I&N Dec. at 819.

Velásquez's efforts to define the term only highlight its ambiguity. At oral argument, Velásquez's counsel suggested that an immigrant would satisfy the "sought to acquire" requirement if the immigrant "surfaced" within one year and could prove it. We fail to see how that explanation makes matters any more clear, much less why that interpretation is compelled by the statutory language. Velásquez's reference to the dictionary definition of "seek" is similarly unrevealing. One dictionary tells us the word may mean: "1. To try to find or discover: search for. 2. To try to obtain or reach. 3. To go to or toward … 4. To ask for: request. 5. To try: endeavor. 6. *Obs[olete].* To explore." WEBSTER'S II: NEW RIVERSIDE UNIVERSITY DICTIONARY 1056 (1994). Which of these six meanings should one choose? The statute does not say. Worse, it does not speak only of seeking something; it also uses the word "acquire," which is no more clear in this con-

text. We see no need to belabor the point: the phrase "sought to acquire" is one that is ambiguous enough to satisfy the first step of *Chevron.*

This takes us to step two, in which we must decide whether the Board has offered a reasonable interpretation. If so, its understanding must prevail, even if we might have preferred a different approach. See *Holder v. Martinez Gutierrez*, 132 S. Ct. 2011, 2017 (2012); *Negusie*, 555 U.S. at 517; see also *Emergency Servs. Billing Corp., Inc. v. Allstate Ins. Co.*, 668 F.3d 459, 466 (7th Cir. 2012); *Chevron*, 467 U.S. at 842. We assess the reasonableness of the Board's interpretation "in light of the legislative history, the purpose of the statute, and comparative statutes." *Emergency Servs.*, 668 F.3d at 466.

The Board filled the statutory gap with the following rule:

> [A]n alien may satisfy the "sought to acquire" provision … by properly filing the application for adjustment of status with the [Department of Homeland Security]. Additionally, the alien may meet the requirement by establishing, through persuasive evidence, that an application he or she submitted to the appropriate agency was rejected for a procedural or technical reason or that there were other extraordinary circumstances, particularly those where the failure to timely file was due to circumstances beyond the alien's control.

*O. Vasquez*, 25 I&N Dec. at 823. Under this rule, immigrants subject to the Act normally will know what is required of them: file an application within one year of visa eligibility,

unless extraordinary circumstances prevent this step. (What they may not know is which flaws will be considered minor enough to qualify as procedural or technical glitches.)

The Board hoped that its rule would, in the normal run of cases, provide clarity and consistency for immigration courts. *Id*. at 821 ("Interpreting the statute in this manner … 'promotes consistency and predictability, which are important principles in immigration law.'") (quoting *Matter of C-T-L-*, 25 I&N Dec. 341, 347 (B.I.A. 2010)). We cannot say the Board acted unreasonably in coming to the conclusion that a simple one-year filing requirement, with limited exceptions, better serves the goal of uniformity than the more nebulous "substantial steps" test it rejected.

This is true even if we accept, as Velásquez and *amicus curiae* urge, that the Board's interpretation frustrates the Act's purpose to prevent the adult children of permanent residents from "aging out" and to keep families together. That may aptly describe Congress's broader statutory purpose for the Act, see *Tovar*, 646 F.3d at 1304, but Congress saw fit to limit the Act's reach to those immigrants who "sought to acquire the status of an alien lawfully admitted for permanent residence within one year." 8 U.S.C. § 1153(h)(1)(A). In other words, this statute, like most, balances competing *desiderata*. In a system in which only a limited number of visas are made available at any given time, see 8 U.S.C. § 1152(a), and petitioners often wait years for a visa, the Act's one-year limitation allows unused visas to be recaptured and reallocated to others awaiting such visas. As the Board is entrusted to administer the statute, we defer to its judgment.

**IV**

The more difficult question before us is whether the *O. Vasquez* rule should have been applied retroactively to Velásquez, even though his one-year period expired months *before O. Vasquez* was decided. We review determinations about the retroactive effect of legal rules *de novo* without giving any deference to the agency on that question. *Zivkovic*, 724 F.3d at 898–900; see also *INS v. St. Cyr*, 533 U.S. 289, 320 n.45 (2001).

As a general rule, "[r]etroactivity is not favored in the law." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). The Supreme Court has explained that this aversion to retroactive rulemaking

> is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic. Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted. For that reason, the principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal human appeal.

*Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994) (internal quotation and citations omitted). In the immigration context, the reluctance to impose rules retroactively is "buttressed by 'the longstanding principle of construing any lingering am-

biguities in deportation statutes in favor of the alien.'" *St. Cyr*, 533 U.S. at 320 (quoting *Cardoza-Fonseca*, 480 U.S. at 449).

A rule is considered to be retroactive when it "attaches new legal consequences to events completed before its enactment." *Landgraf*, 511 U.S. at 270. The inquiry "demands a commonsense, functional judgment" and "should be informed and guided by familiar considerations of fair notice, reasonable reliance, and settled expectations." *Martin v. Hadix*, 527 U.S. 343, 357–58 (1999) (internal quotation omitted); see also *Landgraf*, 511 U.S. at 270 ("[R]etroactivity is a matter on which judges tend to have 'sound instincts[.]'") (quoting *Danforth v. Groton Water Co.*, 59 N.E. 1033, 1034 (Mass. 1901) (Holmes, J.)). Justice Story provided the classic formulation: a legal rule has retroactive effect when it "'takes away or impairs vested rights acquired under existing laws, or creates new obligations, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past.'" *St. Cyr*, 533 U.S. at 321 (quoting *Soc'y for Propagation of Gospel v. Wheeler*, 22 F. Cas. 756, 767 (C.C.D.N.H. 1814) (Story, J.)). As applied to Velásquez, the Board's decision in *O. Vasquez* has retroactive effect because it created a new obligation—the duty to file a visa petition within one year, rather than merely take substantial steps toward filing—after Velásquez's one-year filing window had already expired.

The appropriate standard for determining whether a legal rule may be applied retroactively depends on the source of the rule. For statutory rules, courts presume that a rule lacks retroactive effect "absent clear congressional intent favoring such a result." *Landgraf*, 511 U.S. at 280; see also *Var-*

*telas v. Holder*, 132 S. Ct. 1479, 1491 (2012) ("The operative presumption, after all, is that Congress intends its laws to govern prospectively only.") (citation and quotation omitted). The *Landgraf* analysis applies equally to administrative rules, except that in the latter case the court asks "whether Congress has expressly conferred power on the agency to promulgate rules with retroactive effect and, if so, whether the agency clearly intended for the rule to have retroactive effect." *Durable Mfg. Co. v. U.S. Dep't of Labor*, 578 F.3d 497, 503 (7th Cir. 2009). Such legislative and quasi-legislative rules are presumed not to have retroactive effect because the enacting authorities' "responsivity [*sic*] to political pressures poses a risk that it may be tempted to use retroactive legislation as a means of retribution against unpopular groups or individuals." *St. Cyr*, 533 U.S. at 315 (quoting *Landgraf*, 511 U.S. at 266); see also Stephen H. Legomsky, *Fear and Loathing in Congress and the Courts: Immigration and Judicial Review*, 78 TEX. L. REV. 1615, 1626 (2000) (observing that, because noncitizens cannot vote, they are particularly vulnerable to adverse legislation).

The presumption against retroactive application of legal rules is reversed, however, in the special case where a court furnishes the new rule. See *Harper v. Va. Dep't of Tax.*, 509 U.S. 86, 97 (1993) ("When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule."). (It is an open question whether *Harper* leaves anything of the three-part test for retroactivity of judicial rules established in *Chevron Oil Co. v. Huson*, 404 U.S. 97 (1971). See *Nunez-Reyes v. Holder*, 646 F.3d 684, 690–91

(9th Cir. 2011); *Kolkevich v. Att'y Gen. of U.S.*, 501 F.3d 323, 337 n.9 (3d Cir. 2007); *Fairfax Covenant Church v. Fairfax Cnty. Sch. Bd.*, 17 F.3d 704, 710 (4th Cir. 1994); *Glazner v. Glazner*, 347 F.3d 1212, 1216–17 (11th Cir. 2003) (en banc); *Hulin v. Fibreboard Corp.*, 178 F.3d 316, 333 (5th Cir. 1999). But we have no cause to consider that question in this case.) The reasons that judicial decisions are treated differently are rooted in the differences between judicial and legislative institutions. See *Harper*, 509 U.S. at 107 (Scalia, J., concurring) ("'[T]he province and duty of the judicial department [is] to say what the law *is*,' *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)—not what the law *shall be*.") (citation omitted); see also *Rivers v. Rdwy. Exp., Inc.*, 511 U.S. 398, 312–13 (1994).

In principle, one might wonder where agency adjudications in which rules are announced fit into this framework, given their blended legislative and judicial character. The Board (like the National Labor Relations Board) is a policy-making institution capable of "announcing new principles in an adjudicative proceeding rather than through notice-and-comment rulemaking." *Negrete-Rodriguez v. Mukasey*, 518 F.3d 497, 503 (7th Cir. 2008) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947)). It is the Board's status as an agency that earns it the *Chevron* deference we have given to its interpretation of the INA. But precisely because it *is* an agency, we join the Ninth Circuit in rejecting "the government's position that the [Board], as the authoritative interpreter of an ambiguous statute, has issued an interpretation … that is comparable to a judicial construction of a statute and is an authoritative statement of what the statute meant *before* as well as after the decision of the case giving rise to that construction." *Garfias-Rodriguez v. Holder*, 702 F.3d 504, 515 (9th Cir. 2012) (en banc) (internal quotation omitted). Rather, as we

would with any agency rule, we start from the premise that the Board "may not apply a new rule retroactively when to do so would unduly intrude upon reasonable reliance interests." *Negrete-Rodriguez*, 518 F.3d at 503–04 (internal quotation omitted). The only exception is retroactive application to the litigant whose case gave rise to the new rule: that person had an opportunity to present argument to the agency and ran the risk that the agency would use his case to announce a rule. For others, however, a new agency rule announced by adjudication is no different from a new agency rule announced by notice-and-comment rulemaking, for purposes of retroactivity analysis.

To evaluate whether a new legal rule adopted in an agency adjudication may be applied retroactively to strangers to the case, we apply the same test as our sister circuits. See *NLRB v. Wayne Transp.*, 776 F.2d 745, 751 n.8 (7th Cir. 1985); *Retail, Wholesale & Dep't Store Union v. NLRB*, 466 F.2d 380, 390 (D.C. Cir. 1972) (*Retail, Wholesale*); *Clark-Cowlitz Joint Op. Agency v. FERC*, 826 F.2d 1074, 1081 (D.C. Cir. 1987) (en banc) ("[*Retail, Wholesale*] provides the framework for evaluating retroactive application of rules announced in agency adjudications."); *Garfias-Rodriguez*, 702 F.3d at 518 (discussing the test to be applied in "the situation when a new administrative policy is announced and implemented through adjudication") (quotation omitted); *McDonald v. Watt*, 653 F.2d 1035, 1042 (5th Cir. 1981). This approach strives to balance the adjudicative and policymaking functions of administrative agencies. "The general principle is that when as an incident of its adjudicatory function an agency interprets a statute, it may apply that new interpretation in the proceeding before it. … [But] a retrospective application can properly be withheld when to apply the new rule to past conduct or pri-

or events would work a manifest injustice." *Clark-Cowlitz*, 826 F.2d at 1081 (quotation omitted).

Courts consider a number of factors in assessing whether retroactive application of a rule is manifestly unjust, including the following:

> (1) Whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well-established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard.

*Wayne Transp.*, 776 F.2d at 751 n.8 (quoting *Retail, Wholesale*, 466 F.2d at 390); see also *Negrete-Rodriguez*, 518 F.3d at 504. Like most such unweighted multi-factor lists, this one serves best as a heuristic; no one consideration trumps the others. With that in mind, we look to see what insight these considerations offer for Velásquez's case.

The first point in our list asks whether the particular case is one of first impression. The term "first impression" as used in this context, however, is misleading "insofar as it differs from the more typical understanding of the term as referring to situations in which an agency confronts an issue that it has not resolved before." *Clark-Cowlitz*, 826 F.2d at 1082 n.6. In this context, as we noted earlier, a rule is more likely to apply "retroactively" in the case where it is first an-

nounced (that is, to the parties involved in that case) than in later cases in which it might apply to conduct of others that took place before its announcement. *Id.* Bearing that in mind, we have no quarrel with the application of the *O. Vasquez* rule to O. Vasquez himself. That was the case of "first" impression, and O. Vasquez never appealed the Board's decision, so no court ever had the chance to pass on the retroactivity of the rule in his case. If a court had considered his case, it is possible that a full analysis under the rest of the *Retail, Wholesale* framework might have pointed to retroactive application of the rule. Unlike Velásquez, who promptly consulted an attorney, retained the attorney, filed a FOIA request related to his quest for permanent status, and submitted a complete application soon after immigration authorities gave him a deadline for doing so, O. Vasquez did nothing more than consult a notary (through his parents) about the possibility of filing an application. See *O. Vasquez*, 25 I&N Dec. at 2. We can assume, therefore, that for several reasons retroactive application of the one-year filing rule was appropriate in O. Vasquez's case. That does not mean, however, that the same is necessarily true for Velásquez.

The pertinent question is whether the new rule may be applied retroactively in later cases (that is, in cases that propose to apply the newly announced rule to persons who were not involved in the case of first impression) against persons like Velásquez, who had no notice that the rules were about to change and who may have relied on the former legal regime. See *Garfias-Rodriguez*, 702 F.3d at 520–21. The timing of the announcement of the *O. Vasquez* rule, we conclude, militates against retroactive application. In Velásquez's case, the government did not challenge any established doctrines, but instead sought to have the new *O.*

*Vasquez* rule retroactively applied against Velásquez even though Velásquez's earlier conduct may well have satisfied the legal requirements in effect at the time he took those steps. That is exactly the kind of "second impression" case that the first point in the D.C. Circuit's *Retail, Wholesale* list suggests should not apply the new rule retroactively.

The second and third considerations mentioned in the list are closely intertwined. The second asks whether the new rule represents an abrupt departure from well-established practice or merely attempts to fill a void in an unsettled area of law. The third examines the extent to which the party against whom the new rule is applied may have relied on the former rule. These considerations "require[] the court to gauge the unexpectedness of a rule and the extent to which the new principle serves the important but workaday function of filling in the interstices of the law." *Clark-Cowlitz*, 826 F.2d at 1082; *Garfias-Rodriguez*, 702 F.3d at 521 (favoring retroactivity "if a party could reasonably have anticipated the change in the law such that the new requirement would not be a complete surprise") (quotation omitted). In short, "the longer and more consistently an agency has followed one view of the law, the more likely it is that private parties have reasonably relied to their detriment on that view." *Clark-Cowlitz*, 826 F.2d at 1082–83. Importantly, the critical question is not whether a party actually relied on the old law, but whether such reliance would have been reasonable. See *Vartelas*, 132 S. Ct. at 1491 ("Although not a necessary predicate for invoking the antiretroactivity principle, the *likelihood of reliance* on prior law strengthens the case for reading a newly enacted law prospectively") (emphasis added).

The answers to these questions also point against retroactive application of the one-year filing requirement established in *O. Vasquez*. Although *O. Vasquez* was the first precedential Board decision directly to interpret the Act's "sought to acquire" language, it broke new ground. Up to that time, guidance all pointed toward an understanding of "sought to acquire" that called only for substantial steps to be taken. See *In re Murillo*, *supra*, 2010 WL 5888675, at *4 ("Congress intended that the alien must make an attempt to get or obtain status as a lawful permanent resident within 1-year [*sic*] of such eligibility, lesser actions than contemplated by use of the terms 'file,' 'submit,' and 'apply'") (quotation omitted); *In re Ji Young Kim*, *supra*, 2004 WL 3187209, at *3 (reversing immigration judge's ruling that immigrant failed to comply with statute because application not filed within one year); *In re Castillo-Bonilla*, *supra*, 2008 WL 4146759, at *2; see also *Tovar*, 646 F.3d at 1305 ("We find the BIA's reasonable interpretation in these cases to be persuasive and in sync with the intent of Congress in enacting the Act. Hence, we conclude that Congress's use of the term 'sought to acquire' in the Act is broad enough to encompass substantial steps taken toward the filing of the relevant application during the relevant time period, but does not require that the alien actually file or submit the application.").

Before *O. Vasquez*, neither the Board nor any court had interpreted the "sought to acquire" language of the Act to require a petitioner to file his visa application within one year. In an effort to counter this unfavorable fact, the government directs us to two Board decisions that purportedly construe "sought to acquire" to mean "file" or "apply." See *In re Cheryl Tan Fernandez*, No. A75 475 621, 2005 WL 1848352 (B.I.A. May 6, 2005) (per curiam); *In re Xiuyu Wang*, 25 I&N Dec. 28

(B.I.A. 2009). Neither case, in our view, goes this far. In *Wang*, the Board expressly stated that it would "not address the question" whether the petitioner's failure to file a visa petition within one year barred application of the Act. *Id.* at 33. Similarly, in *Fernandez*, the Board did not reach the question because the petitioner took no steps to acquire permanent status for over five years after becoming eligible. 2005 WL 1848352, at *1. In *O. Vasquez* itself, the Board cited no prior cases in support of its interpretation of "sought to acquire," although it professed without elaboration that "other unpublished Board decisions [] interpreted 'sought to acquire' more restrictively." 25 I&N Dec. 817 at 822.

In light of the state of the law at the critical time, a reasonable person reasonably could have assumed that the Act did not require him or her to file an application within one year. Before the sea change in *O. Vasquez* in 2012, which occurred too late for Velásquez to comply with it, the "substantial test" steps had been consistently applied to the "sought to acquire" language in the Act since 2004. *Cf. Garfias-Rodriguez*, 702 F.3d at 522 (applying rule retroactively where prior rule in effect for 21 months, during which time petitioner took no action in reliance); *Clark-Cowlitz*, 826 F.2d at 1083–84 (applying rule retroactively where previous rule was in place for six months, during which time it was "beclouded" by possibility of being overturned on appeal). The Board's new one-year filing rule in *O. Vasquez* did not merely fill a void "in the interstices of the [statute]," *Retail, Wholesale*, 466 F.2d at 391 (quoting *Chenery*, 332 U.S. at 202–03); rather, the new one-year filing rule reflected a shift in position "solely as a result of a change in agency policy," *Clark-Cowlitz*, 826 F.2d at 1083. In such a case, retroactive application is disfavored.

It is also worth noting that the state of the law at the time of his application makes it virtually impossible for Velásquez to claim ineffective assistance of his retained counsel for failing to advise him to file an application before his one-year window expired. See *In re Compean*, 25 I&N Dec. 1, 1–2 (B.I.A. 2009) (reinstating standards for reviewing motions to reopen deportation proceedings based on claims of ineffective assistance). Recall that Velásquez met with an attorney to discuss obtaining his "green card" within weeks of becoming eligible for permanent status, retained the attorney to investigate his eligibility, and allowed the attorney to file a FOIA request on his behalf to that end. When the immigration judge provided Velásquez with a filing deadline during his deportation proceedings (itself a clear sign that no one-year filing deadline then-existed), he diligently complied with it, submitting his application a week early. Until *O. Vasquez* appeared, competent counsel might have considered such steps to be substantial moves toward acquiring permanent status, and might not have recognized that the application itself had to be submitted within one year.

The fourth *Retail, Wholesale* inquiry concerns how much of a burden a retroactive order would impose on a party. For Velásquez, that burden is immense: he faces removal from the only country he has called home since he was seven years old. Courts have long recognized the obvious hardship imposed by removal. *E.g.*, *St. Cyr*, 533 U.S. at 322 ("Preserving the [immigrant]'s right to remain in the United States may be more important to the [immigrant] than any potential jail sentence.") (quotation omitted); *Vartelas*, 132 S. Ct. at 1487 (explaining that the Court has "several times recognized the severity of [the] sanction" of deportation); *Padilla v. Kentucky*, 559 U.S. 356, 369 (2010); *Miguel-Miguel v. Gonzales*,

500 F.3d 941, 952 (9th Cir. 2007) ("[D]eportation alone is a substantial burden that weighs against retroactive application of an agency adjudication."). Non-retroactivity will not impose undue costs on the United States, because few petitioners will be similarly situated to Velásquez, either from the standpoint of timing or that of reliance. The fourth consideration identified by *Retail, Wholesale* thus also favors Velásquez. See *Garfias-Rodriguez*, 702 F.3d at 523.

Finally, we are advised to assess the statutory interest in applying the new rule despite the reliance of a party on the old standard. Often, this will "point[] in favor of the government because non-retroactivity impairs the uniformity of a statutory scheme, and the importance of uniformity in immigration law is well established." *Id.* Here, however, the general interest in uniformity must be assessed in light of the broader statutory purpose of the Act to "provide[] age-out protection for derivative child beneficiaries adversely affected by administrative delays in the adjudication of immigrant petitions." *Tovar*, 646 F.3d at 1304. The eight years it took the Board to redefine what the Act's "sought to acquire" language requires is an administrative delay. Retroactively applying the Board's new interpretation of the Act against Velásquez would squarely contradict the purpose of the statute.

In sum, our analysis persuades us that this is a case "where the [agency] had confronted the problem before, had established an explicit standard of conduct, and now attempts to punish conformity to that standard under a new standard subsequently adopted." *Retail, Wholesale*, 466 F.2d at 391. We conclude that retroactive application of the *O.*

*Vasquez* one-year filing requirement would work a manifest injustice on Velásquez.

**V**

Because retroactive application of the *O. Vasquez* rule on Velásquez is manifestly unjust, we GRANT the petition for review and REMAND to the Board for determination whether Velásquez took "substantial steps" to acquire permanent status within one year of his eligibility, as provided by the standard in effect prior to *O. Vasquez*.